724 A.2d 895

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Dennis MILLER, Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 18, 1998.

Decided Jan. 20, 1999.

Robert Kerry Kalmbach, Kennett, SQ, for D. Miller.

Robert Louis Miller, West Chester, Robert A. Graci, Harrisburg, Nicholas J. Casenta, Jr., for Commonwealth.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

Appellant, Dennis L. Miller ("Miller"), appeals from the sentence of death imposed following his convictions for murder in the first degree, rape, indecent assault, recklessly endangering another person, possession of instruments of crime, and flight to avoid apprehension. The convictions stemmed from the killing of Miller's wife. We affirm.

Miller resided with his wife, Sherry, and their two children, Barbara and Dennis, who at the time were twelve and four, at 301 Church Alley, Londongrove Township, Chester County. Miller's marital relationship was, however, strained as a consequence of drug use, as well as jealousy and physical abuse directed toward his wife. Notably, in July of 1994, Miller pled guilty to harassment and disorderly conduct arising from an altercation with Sherry, and, in April of 1995, he pled guilty to aggravated assault in connection with an incident in which he held a gun to Sherry's head. As a result of the latter conviction, Miller was imprisoned for a term of nine to twenty-three months.

While in prison, Miller professed a desire to kill Sherry, and on the day of his release in September of 1995, he told his cellmate, "I'll be back for killing my wife." Following his release from prison, Miller resumed living with his wife and children.

On November 18, 1995, Miller made arrangements with his mother, Agnes Miller, to supervise his children while he and Sherry visited a local tavern, Trib's Waystation. At the bar, Miller and his wife drank beer and, at one point, ingested methamphetamine. Although Miller did not appear to be intoxicated, during the course of the evening he became angry whenever his wife either spoke to another man or used the telephone.[1] At approximately 12:30 a.m. Miller and his wife left the bar.

On Sunday, November 19, Agnes Miller was surprised when Miller and his wife did not arrive during the breakfast hour as planned to retrieve their children. As the day progressed, she became increasingly concerned. Miller's daughter, Barbara, repeatedly telephoned the family residence, but no one answered. In addition, Agnes Miller drove to Miller's home on two or more occasions. On each occasion, she observed that the house was locked, no one answered the door, and Sherry's vehicle was missing. Initially, Agnes Miller was concerned because Barbara was asthmatic and her medicine was located in Miller's home. Indeed, later that day, Barbara was taken to the hospital for treatment of an asthmatic attack. Ultimately, on Monday, November 20, Agnes Miller contacted Sherry's mother, Mary Folk, to determine whether she had heard from her daughter. As Ms. Folk had not, she filed a missing persons report with the Pennsylvania State Police.

In response to this report, the investigating trooper contacted the employers for Miller and his wife, checked with the local prisons and hospitals, and interviewed family members. Both Agnes Miller and Ms. Folk related to the police that Miller and his wife had used illicit drugs and speculated that they might have traveled to Philadelphia to purchase drugs. The police also went to the Miller home, knocked on the door, and after receiving no response, checked the doors, finding them locked. When these efforts failed, the troopers asked Agnes Miller to meet them at the residence. Once there,

1. Sherry used the telephone at the bar to page Sean Smith, a man she dated during Miller's incarceration. Smith then telephoned Sherry in response to the page.

Agnes Miller again expressed concern that something may have happened to her son and daughter-in-law because of their history of drug abuse. The troopers who met Agnes Miller were familiar with Miller's drug problem and were aware of Miller's history of spousal abuse. At Agnes Miller's request, and after receiving an assurance from her that she would be responsible for the property, the troopers agreed to forcibly enter the residence.

The troopers gained access through a basement window, checked the basement area, climbed a set of stairs to the kitchen, and briefly surveyed the kitchen. Upon hearing a fan on the second story, the troopers announced themselves and proceeded upstairs. In the master bedroom, the troopers observed the contents of a purse strewn about the floor, an open suitcase, and the naked, blood-spattered body of Sherry Miller lying on a bed with her legs spread, knees bent, and with a bloody pillow over her face. After confirming that Miller was not also in the bedroom, the troopers left, secured the house, and waited until investigators arrived with a search warrant.

An autopsy of Sherry Miller revealed that she died as a result of more than thirty stab wounds to her head, neck, chest, arms, and hands. The murder weapon, a knife, was found in a trash can; the tip had been broken off and was recovered from the shoulder of Sherry Miller. In addition to determining the cause of death, the forensic pathologist conducting the autopsy concluded that Sherry Miller had been subjected to forcible intercourse at the time of her death. This finding was premised, in part, upon the position in which her body was found, the defensive wounds on her hands and arms, the seminal material recovered from her vaginal vault, the absence of such material outside her vagina, and the absence of blood spatter in the area just above her vagina and between her legs.

From the crime scene, the police recovered Miller's bloody handprints on the pillow that was used to cover Sherry Miller's face. Furthermore, the police discovered a bloody footprint of Miller and a bandage with Miller's bloody finger-

print in the bathroom area. In addition, the police obtained a partial thumbprint from the murder weapon.[2] The police noted that the box spring from the bed where Sherry Miller was found was broken, and the bed frame was bent. On the kitchen table, the police found a partially empty cup of coffee next to a vengeful note in Miller's handwriting.[3]

The police continued to search for Miller, contacting his friends and family members in an effort to locate him. Although their efforts were unsuccessful, the police were able to trace Miller's flight from the crime scene to Maryland from his use of his wife's automatic teller machine card, and the police found Sherry's vehicle in Maryland; the vehicle contained a baseball cap belonging to Miller and a number of ATM receipts. Miller was ultimately apprehended six months later in Florida, after a tip following a description of the unsolved crime on the America's Most Wanted television program.

Prior to trial, Miller sought to suppress the evidence seized from his residence, alleging that the initial entry of the police was illegal as it was not authorized by a warrant or supported by probable cause. The trial court denied the suppression motion, finding that the actions of the police were justified in response to the concerns, expressed by Agnes Miller and Ms.

**2.** Although this print contained several characteristics consistent with Miller's right thumb, the partial print was insufficient for a positive identification.

**3.** In his note, Miller stated:

Now I hope some of Sherry's whore friends learn something from this. I didn't want for it to go this far, but you people don't understand what she put me through. Some know, but they don't want to say something about her. Everybody told her everything I did, but me, I had to find out for myself what she did. All of my so-called friends f—— me one way or another. I had no friends. And I wish I had more time to get even with some of you assholes. I just want to say that you, Larry Brown, I would have killed you, and you, Sean Smith, I told Donny one time before to tell you to leave her alone. I don't know if he did. And if he did, the next time somebody tells you something, you better do what they say. I would have got you too. I hope somebody in my family takes care of Barb, Dennis. I do love you all. I will see some of you in hell.

Folk, that either Miller or his wife may have been in need of immediate aid.

After an extensive colloquy, Miller elected to proceed with a non-jury trial. At trial, the Commonwealth presented testimony from a forensic pathologist, Richard Callery, M.D., regarding the cause of and circumstances surrounding Sherry Miller's death. Dr. Callery opined that she died from massive internal bleeding resulting from multiple stab wounds, and that she had been subjected to forcible intercourse during the homicide. The Commonwealth also presented testimony from Agnes Miller, as well as a number of witnesses who had seen Miller and his wife at Trib's Waystation on the evening of November 18. In addition, Miller's cellmate during his incarceration for aggravated assault testified to incriminating statements made by Miller. Finally, both sides stipulated to a number of forensic findings, namely, fingerprints, footprints, blood tests, and the results of DNA testing, which linked Miller to the murder.

The defense presented one witness, who testified that Miller's cellmate fabricated the statements he had attributed to Miller. The trial court found Miller guilty of all offenses.

In the penalty phase, the Commonwealth alleged as aggravating circumstances that Miller committed the murder during the perpetration of a felony, rape, 42 Pa.C.S. § 711(d)(6), and that the murder was committed by means of torture, 42 Pa.C.S. § 711(d)(8). After the Commonwealth incorporated the record from the guilt phase, the defense sought to establish mitigating circumstances by presenting psychological testimony regarding Miller's background, upbringing, and psychological profile, as well as testimony from his family members. The trial court found one aggravating circumstance, the Section 9711(d)(6) aggravator, and one mitigating circumstance, that Miller lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, *see* 42 Pa.C.S. § 711(e)(3). However, the trial court concluded that the aggravating circumstance outweighed the mitigating circumstance. On October 27, 1997, the trial court formally imposed the death sentence

with a consecutive term of incarceration of ten to twenty years related to the rape conviction.

 Although Miller has not raised a challenge to the sufficiency of the evidence underlying his first degree murder conviction, in all cases in which the death penalty has been imposed, we are required to review the sufficiency of such evidence. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). To establish murder in the first degree, the Commonwealth must prove that the defendant specifically intended to kill, which is established by proof of premeditation and deliberation. *See Commonwealth v. Weinstein,* 499 Pa. 106, 115, 451 A.2d 1344, 1348 (1982). A specific intent to kill may be proven by circumstantial evidence, *see Commonwealth v. Williams,* 455 Pa. 539, 546–47, 316 A.2d 888, 891 (1974), and can be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Hall,* 549 Pa. 269, 282, 701 A.2d 190, 196 (1997), *cert. denied,* — U.S. ——, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). Where a defendant knowingly applies deadly force to the victim, his specific intent to kill is as evident as if he expressed the intent to kill at the time the force was applied. *Commonwealth v. Auker,* 545 Pa. 521, 539, 681 A.2d 1305, 1315 (1996). Furthermore, no particular period of premeditation is required to form the requisite intent. *See Williams,* 455 Pa. at 547, 316 A.2d at 891.

 In this case, the Commonwealth established that Miller was last seen with the victim shortly before they left Trib's Waystation. Miller's blood-stained handprints, footprints, and fingerprints were found throughout the crime scene; both DNA and biological testing established the existence of his seminal fluid in the victim's vaginal area; a partial thumbprint was found on the murder weapon; and an inculpatory note in Miller's handwriting was also found downstairs. Together with the Commonwealth's expert opinion testimony establishing the brutal manner of death, this evidence amply supported

the conclusion that Miller committed the crime with the specific intent to kill.

Miller raises three claims of trial error. He argues that the trial court erred in denying his motion to suppress evidence; that the evidence supportive of his convictions for rape and indecent assault was insufficient; and finally, that the aggravating circumstance found in support of the death sentence did not outweigh the mitigating circumstance found by the court.

Miller's challenge to the suppression ruling is premised upon the failure of the police to obtain a search warrant prior to their initial entry of Miller's residence and the asserted absence of probable cause to conduct a search. The Commonwealth argues that the initial entry into Miller's home was justified based upon the troopers' reasonable belief that the Millers may have been within the home and in need of aid. Alternatively, the Commonwealth argues that the evidence seized from Miller's home should not be suppressed based upon the inevitable discovery doctrine.

In reviewing a suppression ruling, we determine whether the record supports the suppression court's factual findings and whether the legal conclusions drawn from such findings are free of error. *Commonwealth v. O'Shea*, 523 Pa. 384, 395, 567 A.2d 1023, 1028 (1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990).

As a general rule, only a limited number of circumstances will excuse the police from compliance with the warrant and probable cause requirements of the Fourth Amendment.[4] One such circumstance occurs when the police reasonably believe that someone within a residence is in need of immediate aid. *See Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978); *Commonwealth v. Norris*, 498 Pa. 308, 313, 446 A.2d 246, 248 (1982). Here, the trial court found that the police were not

---

**4.** Although Miller has framed his claim under both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, he does not contend that the analysis of this issue is different under the Pennsylvania Constitution.

investigating a crime, but rather, were responding to requests from concerned family members regarding the safety of Miller and his wife. The trial court noted that such concerns were grounded upon the history of drug use on the part of both individuals, Miller's history of spousal abuse, and the prolonged absence of the Millers, particularly in light of the fact that they had not returned for their children. Miller's children, of course, had the right to gain entry to their own home. Moreover, Barbara Miller was in need of her asthma medication, which was located inside the house.

Thus, contrary to Miller's assertion, this was not a case in which the police created their own exigency and acted upon it, *see, e.g., Commonwealth v. Melendez,* 544 Pa. 323, 330, 676 A.2d 226, 229 (1996); rather, the police acted in response to the urging of Miller's family and based upon a reasonable belief that the Millers were inside the residence and in need of assistance. Hence, the trial court's finding of exigent circumstances is supported by the record. *Cf. Commonwealth v. Silo,* 509 Pa. 406, 410, 502 A.2d 173, 176 (1985)(concluding that police entry into a home was justified when the victim was last observed arguing with the defendant, and the neighbors and the victim's employer reported her missing and urged the police to investigate); *Commonwealth v. Maxwell,* 505 Pa. 152, 164, 477 A.2d 1309, 1315, *cert. denied,* 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984).[5]

Miller labels his next claim as a challenge to the sufficiency of the evidence underlying his convictions for rape and indecent assault, although his argument implicates the weight of the evidence. *See generally Commonwealth v. Goldblum,* 498 Pa. 455, 466–67, 447 A.2d 234, 240 (1982). His contention in this regard is premised upon the testimony of Dr. Callery. While Miller acknowledges that Dr. Callery opined that the

---

5. We also note that as a matter of Fourth Amendment jurisprudence, the evidence seized from Miller's house would also have been admissible because it inevitably would have been discovered. *See Nix v. Williams,* 467 U.S. 431, 449–50, 104 S.Ct. 2501, 2512, 81 L.Ed.2d 377 (1984).

victim was subject to forcible sexual intercourse "concomitant" with the homicide, Miller maintains that there was record evidence to contradict this opinion. In particular, Miller's argument focuses upon the following exchange, which occurred during his counsel's cross-examination of Dr. Callery:

> [Defense Counsel]: What I'm asking you, Doctor, is it's not inconceivable, is it, that there could have been sexual intercourse, the victim not get up off the bed and walk about, and then an attack took place, and that the sexual intercourse was not then related to the attack?
>
> [Dr. Callery]: I testified before that I thought that this was a typical rape/homicide, but the way you phrased the question, that it is not inconceivable, is there a scenario that could be conceived of that, going along with what you say, I would have to say it is conceivable.

Miller implicitly suggests that the evidence is not inconsistent with the possibility that the intercourse was, in fact, consensual rather than forcibly compelled.

To the extent that this argument can be construed as a sufficiency challenge, the crime of rape requires, in relevant part, that the Commonwealth prove that the accused engaged in sexual intercourse by forcible compulsion or by threat thereof. 18 Pa.C.S. § 121(a)(1), (2); *Commonwealth v. Berkowitz*, 537 Pa. 143, 147–48, 641 A.2d 1161, 1163 (1994). Where, as here, the victim of the rape is dead, circumstantial evidence may be used to prove the offense. *See, e.g., Commonwealth v. Thomas*, 522 Pa. 256, 271, 561 A.2d 699, 706 (1989); *Commonwealth v. Holcomb*, 508 Pa. 425, 453, 498 A.2d 833, 847 (1985), *cert. denied*, 475 U.S. 1150, 106 S.Ct. 1804, 90 L.Ed.2d 349 (1986). Here, the Commonwealth established sexual intercourse through the testimony of Dr. Callery, the position of Sherry Miller's body, and DNA evidence of Miller's seminal material. Similarly, the element of forcible compulsion was proven through Dr. Callery's opinion testimony, as well as evidence of the broken box spring, bent bed frame, the position of Sherry Miller's body, the pattern of blood spatter around her vaginal area, and the defense wounds on her arms and hands. Based upon this evidence, the element of forcible

compulsion was constituent to the force employed to commit the murder.[6] As sufficient evidence existed to find Miller guilty of rape, his sufficiency challenge is without merit.[7]

To the extent that Miller's argument implicates an attack on the weight of the evidence, it is directed to the sound discretion of the trial court, and a review of this claim entails a review of the trial court's exercise of its discretion. *See Commonwealth v. Brown*, 538 Pa. 410, 435–36, 648 A.2d 1177, 1189 (1994). As the fact finder, the trial court is free to believe all, some, or none of the evidence presented. *See Commonwealth v. Shaver*, 501 Pa. 167, 173, 460 A.2d 742, 745 (1983). A new trial should only be awarded when the verdict is so contrary to the evidence as to shock one's sense of justice. *See Brown*, 538 Pa. at 435, 648 A.2d at 1189.

Miller argues that Dr. Callery's concession in the above-quoted exchange constitutes contradictory evidence. Even assuming such a dubious proposition, the fact that contradictory evidence exists as to a particular issue does not, by itself, render the verdict so contrary to the evidence that one's sense of justice is shocked. *See Commonwealth v. Pronkoskie*, 498 Pa. 245, 252, 445 A.2d 1203, 1206 (1982). Moreover, the trial court's conclusion that Miller engaged in non-consensual sexual intercourse by forcible compulsion was

6. Although not cited by Miller, the decision in *Commonwealth v. Sudler*, 496 Pa. 295, 436 A.2d 1376 (1981), would appear, at first blush, to lend support to his argument. In *Sudler*, this Court held that the crime of rape pertains only to an assault against a living person. *Id.* at 303, 436 A.2d at 1379. However, Miller did not argue at trial or contend on appeal that the evidence established that the intercourse occurred after the homicide. Moreover, unlike the prosecution in *Sudler*, the Commonwealth presented expert opinion evidence that Miller committed the rape "concomitant" with the homicide.

7. As previously noted, Miller also challenges the sufficiency of the evidence to establish the offense of indecent assault. Preliminarily, we note that Miller's conviction for this offense does not implicate the aggravating circumstance alleged by the Commonwealth under Section 9711(d)(6) of the Judicial Code. 42 Pa.C.S. § 711(d)(6). The offense of indecent assault requires, in pertinent part, proof of indecent contact without the consent of the other person. *See* 18 Pa.C.S. § 3126. In this case, the facts supportive of the rape conviction more than adequately establish this separate offense.

not opposed to the evidence, but rather, was consistent with it. Under such circumstances, there is nothing about the trial court's conclusions that would provide a basis for disturbing the verdict.

In his final claim, Miller challenges the trial court's holding that the existing aggravating circumstance outweighed the mitigating circumstance that was found. Miller also contends that in setting the penalty at death, the trial court relied upon a consideration extraneous to the statutory aggravating circumstances.

 Miller's attack on the trial court's weighing of the aggravating and mitigating circumstances is wholly without merit. The weighing of aggravating and mitigating circumstances is a subjective process, not merely a quantitative procedure. *See Brown,* 538 Pa. at 428–29, 648 A.2d at 1186. Consequently, this task is the sole prerogative of the sentencing authority, which may assign determinative weight to a particular circumstance or circumstances. *Commonwealth v. Gribble,* 550 Pa. 62, 85, 703 A.2d 426, 437–38 (1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 519, 142 L.Ed.2d 430 (1998). For this reason, and based upon our review, we find no legal error in the trial court's decision attaching greater weight to the aggravating circumstance than the mitigating circumstance.

 Miller's final argument, that the trial court entertained an inappropriate consideration in its capital sentencing decision, is based upon the trial court's statement that "it troubles me that the defendant has expressed no remorse whatsoever in connection with this crime." This statement, however, was not made during the trial court's pronouncement respecting its weighing of the aggravating and mitigating circumstances associated with the sentence of death; rather, it occurred during the sentencing for the rape conviction. Miller points to nothing in the record to otherwise suggest that the trial court relied upon his lack of remorse as a non-statutory aggravating factor in its death penalty determination. Moreover, the demeanor of a convicted defendant, including his

apparent lack of remorse, is a proper consideration in fixing the sentence for a non-capital offense. *See generally Commonwealth v. Travaglia,* 502 Pa. 474, 499, 467 A.2d 288, 301 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984).[8]

Having concluded that Miller's claims are without merit, we are required to affirm the judgment of sentence unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in Subsection (d).

42 Pa.C.S. § 711(h)(3).[9]

After reviewing the record, we conclude that the sentence of death imposed in this case was not the product of passion, prejudice or any other factor, but rather, was based upon evidence that Miller killed his wife with specific intent. In addition, we conclude that the aggravating circumstance found by the trial court was supported by the evidence. The Commonwealth presented evidence that Miller killed his wife while committing a rape, thus establishing that the homicide was committed during the perpetration of a felony. *See* 42 Pa.C.S. § 711(d)(6).

Accordingly, we affirm the verdict and the sentence of death imposed upon Dennis Miller by the Court of Common Pleas of Chester County.[10]

8. It is noteworthy that the Court in *Travaglia* stated that the sentencing authority in a capital case may consider a defendant's apparent lack of remorse. *See id.*

9. By legislation enacted June 25, 1997, Subsection (h)(3)(iii), which provided for proportionality review, and a portion of Subsection (h)(4) that references such review, were stricken from Section 9711(h). *See* Act of June 25, 1997, No. 28, Section 1 (Act 28, effective immediately). As Miller's sentence of death was imposed after June 25, 1997, a proportionality review of his sentence is not required. *See Gribble,* 550 Pa. at 91, 703 A.2d at 440.

10. Pursuant to Section 9711(i) of the Judicial Code, 42 Pa.C.S. § 9711(i), the Prothonotary of the Supreme Court is directed to trans-

mit the complete record of this case to the governor of Pennsylvania
within 90 days.