J-A18019-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| DONALD JOHN BRILL | |
| Appellant | No. 1956 MDA 2013 |

Appeal from the Judgment of Sentence of October 3, 2013
In the Court of Common Pleas of Lancaster County
Criminal Division at No.: CP-36-CR-0002696-2012

BEFORE: LAZARUS, J., WECHT, J., and MUSMANNO, J.

DISSENTING MEMORANDUM BY WECHT, J.:      **FILED MAY 15, 2015**

Today's learned Majority holds that Officer Daniel Nipper was permitted to direct Eugene Nolt to enter Donald Brill's home through a window, and, more importantly, without a warrant, pursuant to the immediate aid exception to the warrant requirements of the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. Thereafter, the Majority concludes that some of the incriminating evidence that was observed by the police once inside Brill's home was retrievable pursuant to the plain view doctrine. I disagree with the Majority's application of the immediate aid exception, and would hold that the entry into Brill's home was unconstitutional from the moment that Mr. Nolt climbed through Brill's window. Hence, I respectfully dissent.

On February 10, 2012, Officer Nipper, a police officer with the East Earl Township[1] Police Department, and others entered Brill's home without a warrant, and seized, *inter alia*, potted marijuana plants and loose marijuana in glass jars. The police later performed two additional searches of the home upon the consent of both Brill and his wife. Those searches produced additional marijuana (stored in baggies), as well as marijuana-cultivating equipment. As a result of the searches, Brill was charged with one count each of manufacturing a controlled substance, possession of a controlled substance, and possession of drug paraphernalia.[2]

Prior to trial, Brill filed a motion seeking to suppress the marijuana and the paraphernalia. On May 10, 2013, the trial court held a hearing on the motion. The following represents a summary of the evidence and testimony produced at that hearing.

On February 10, 2012, Officer Nipper was dispatched by radio to assist on a call for an ambulance at Brill's residence, 1081 Weaverland Road, East Earl Township. Officer Nipper arrived at the residence at approximately 10:25 a.m., and located Sandra Baumer. Ms. Baumer informed Officer Nipper that she was concerned about the well-being of her sister, Carol Brill (Brill's wife), who had been suffering from fainting spells in the prior days

_____

[1] East Earl Township is located in Lancaster County, Pennsylvania.
[2] 35 P.S. §§ 780-113(a)(30), (16), and (32), respectively.

and weeks. Ms. Baumer reported that, although her sister's car was parked at the house, Ms. Brill did not respond to Ms. Baumer's telephone calls or to knocks on the door at the Brill residence. Officer Nipper also knocked on the door in an attempt to contact Ms. Brill, to no avail.

Ms. Baumer told Officer Nipper that a window at the rear of the house was unlocked. Before Officer Nipper could take any further action, Mr. Nolt, who is a trained volunteer firefighter and also Brill's neighbor, arrived at the Brill residence. Noting that Mr. Nolt was smaller in size, Officer Nipper asked Mr. Nolt to enter the residence through the unlocked window, and to open the door once inside so that Officer Nipper could commence a search for Ms. Brill. Mr. Nolt obliged, entering the residence through the window, and then opening the front door. Officer Nipper, as well as two EMTs who had arrived at the scene, then proceeded into the residence.

Once inside, Officer Nipper, Mr. Nolt, the two EMTs, and Ms. Baumer commenced a search of the home for Ms. Brill. Officer Nipper repeatedly called out for Ms. Brill, but received no response. During his search, Officer Nipper noticed a closet in Brill's bedroom that was closed and blocked with a chair. Officer Nipper opened the closet and, on a shelf therein, found two glass jars filled with loose marijuana. Officer Nipper also found rolling

papers, a cigarette-rolling machine, and other marijuana-related paraphernalia in the bedroom.[3]

Officer Nipper continued his search for Ms. Brill on both the main floor and the second floor of the residence, with no success. While Officer Nipper was searching those areas, Mr. Nolt looked for Ms. Brill in the basement. Mr. Nolt did not find Ms. Brill there, but told Officer Nipper that there was "something down there that [he] needed to see." Notes of Testimony, 5/10/2013, at 7-8. Based upon Mr. Nolt's comment, Officer Nipper proceeded to the basement. In the basement, Officer Nipper failed to locate Ms. Brill, but he did find three potted marijuana plants hidden behind a makeshift curtain under the stairs. Officer Nipper seized the jarred marijuana, the potted plants, and the paraphernalia, sealed the residence, left a business card containing his contact information, and departed.

A short time later, having found the business card, Ms. Brill contacted Officer Nipper.[4] Ms. Brill then went to the police station and met with the officer. She admitted to Officer Nipper that Brill grows marijuana inside the home, and that he has done so for approximately two years. After initial discussions, Ms. Brill and Officer Nipper drove to the Brill residence. There,

---

[3]   Officer Nipper did not specify the items among those he found which he considered to be marijuana-related paraphernalia.

[4]   The record does not reveal Ms. Brill's whereabouts during the initial search.

after Officer Nipper explained the terms of the consent-to-search form,[5] Ms. Brill signed the form.

When Officer Nipper entered the home with Ms. Brill, he asked her to locate the contraband for him so that he did not have to disturb her home with a thorough search. Ms. Brill directed Officer Nipper to numerous bags of marijuana that were stashed in the bottom drawer of a set of cupboards in the living room.

Later that day, Officer Nipper spoke with Brill, and asked him if he would be willing to discuss the contraband that was found in his home. Brill agreed to meet with Officer Nipper at the police station. Brill waived his *Miranda* rights, and spoke with the officer. Brill confessed to Officer Nipper that the marijuana was his, and that he acted entirely alone in growing and cultivating it. Brill claimed that he grew the marijuana for his own personal use; he purportedly used the marijuana for pain relief.

Officer Nipper also asked Brill about a certain room in the residence that was locked. Brill confirmed that the room was kept locked, and that he was the only person with access to that room. Officer Nipper and Brill then proceeded to the residence, whereupon Brill signed a consent-to-search form, and allowed Officer Nipper into the home. Officer Nipper asked Brill to open the locked room, and Brill did so. Inside, Officer Nipper observed a

---

[5]    This explanation included a statement that Ms. Brill could refuse to consent to a search.

large amount of marijuana-growing equipment, including an insulated tent, growing lights, a ventilation system, chemicals, calendars that displayed planting and harvesting dates, and a seedling box used to grow the plants from seeds until they are large enough to be planted in the growing tent. Officer Nipper photographed and then seized all of this equipment. Brill was arrested and charged with the aforementioned crimes.

On July 3, 2013, the trial court entered an order upholding the warrantless entry and the subsequent consent searches of Brill's home, with the exception of the search of Brill's bedroom closet. In the order, the trial court concluded that Officer Nipper constitutionally was permitted to enter Brill's home without a warrant because he reasonably believed that Ms. Brill was in need of immediate aid, a long-standing exception to the warrant requirement of both the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution. However, the court held that it was unreasonable for Officer Nipper to believe that Ms. Brill could have been located in Brill's bedroom closet, which was closed and blocked by a chair. *See* Order, 7/3/2013, at 3 ("It was not reasonable to believe that Ms. Brill could have entered the closet and then proceeded to put a chair in front of the closed door. Not to mention the closet was very small in size and there is no [feasible] way Ms. Brill could have fainted inside.").

On October 3, 2013, Brill waived his right to a jury trial, and proceeded to a stipulated non-jury trial. At the conclusion of the stipulated

trial, the trial court found Brill guilty of the aforementioned crimes. The same day, Brill was sentenced to an aggregate two-year term of probation and a three hundred dollar fine.

For the reasons that follow, I would vacate Brill's judgment of sentence, and order that the evidence seized from Brill's home be suppressed.

The Fourth Amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV. Similarly, the text of Article 1, Section 8 of the Pennsylvania Constitution states the following:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I, § 8.

Based upon the plain language of these fundamental tenets, it is well-settled that "a search warrant is required before police may conduct any search." *Commonwealth v. White*, 669 A.2d 896, 900 (Pa. 1995). Absent the application of one of a few clearly delineated exceptions, a warrantless

search or seizure is presumptively unreasonable. *Id.* (citing *Horton v. California*, 496 U.S. 128, 134 n.4 (1990)). "Generally, the police will be excused from compliance with the warrant and probable cause requirements of the Fourth Amendment to the United States Constitution [and Article 1, Section 8 of the Pennsylvania Constitution] in **only limited circumstances**." *Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009) (emphasis added). One such circumstance is when "police reasonably believe that someone within a residence is in need of immediate aid." *Id.*; *see also Commonwealth v. Potts*, 73 A.3d 1275, 1280 (Pa. Super. 2013); *Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009). "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978) (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)).

In applying this exception, the relevant inquiry is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Potts*, 73 A.3d at 1280 (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 1280-81 (quoting *Ryburn v. Huff*, 132 S.Ct. 987, 992 (2012) (*per curiam*)).

The question presented in this case is whether the circumstances preceding Officer Nipper's warrantless entry into Brill's home provided an objectively reasonable basis for Officer Nipper to believe that someone inside the residence was in need of immediate aid. The trial court concluded that the circumstances sufficed to justify the warrantless entry because "Officer Nipper reasonably believed [that Ms.] Brill was in need of immediate medical aid." Trial Court Opinion ("T.C.O."), 12/26/2013, at 3. However, I am not convinced that the facts of this case readily validate the conclusion that the entry constitutionally was valid. To the contrary, the facts present a close call, which requires an examination of the facts and circumstances of some Pennsylvania cases that previously have applied the immediate aid exception.

Our Supreme Court applied the immediate aid exception in **Commonwealth v. Silo**, 502 A.2d 173 (Pa. 1985). In that case, Silo's neighbors heard an argument and loud screams emanating from the home that Silo shared with his mother. **Id.** at 174. Shortly thereafter, the neighbors observed Silo sitting on the front porch, and then being taken away by an ambulance. The neighbors did not see Silo's mother leave for work that day at her usual time, nor did she return to her home at her normal time. **Id.** at 175. Additionally, Silo's mother did not close her bedroom window before or during the night, which she almost always did. The following day, the neighbors became concerned because they still had

not seen Silo's mother. They called the local hospital and the mother's place of employment, but they were unable to locate her. *Id*.

Silo's mother's employer also became concerned when she did not report for work. The employer called her home once every hour until approximately midnight, to no avail. The following day, neither the neighbors nor the employer were able to locate Silo's mother. They contacted the police, who went to the hospital, retrieved a key from Silo, and used the key to open the door to the home. Inside, they found Silo's mother lying dead in a pool of her own blood. She had been stabbed repeatedly by Silo. *Id.*

Noting that "the Fourth Amendment does not bar police officers from making warrantless entries and searches of houses when they reasonably believe that a person within is in need of immediate aid," our Supreme Court upheld the warrantless entry into Silo's home. *Id.* at 175.

In *Commonwealth v. Miller*, 724 A.2d 895 (Pa. 1999), the Pennsylvania Supreme Court also applied the immediate aid exception, and upheld the constitutionality of a warrantless entry into Miller's home based upon the following sequence of events. Miller, who lived with his wife and children, had a history of drug use and assaultive behavior towards his wife. *Id.* at 897. In one instance, Miller was convicted of aggravated assault, and imprisoned, for holding a gun to his wife's head. On the exact day that he was released from prison, Miller told his cellmate that he would be returning to prison soon for killing his wife. *Id.*

- 10 -

Shortly after his release from prison, Miller and his wife went drinking at a local bar. After imbibing alcoholic drinks and ingesting methamphetamine, Miller became increasingly agitated towards his wife, especially after she talked to another man and after she used the telephone. While they were at the bar, Miller's mother was babysitting Miller's children. Miller was supposed to pick the children up from his mother's house around breakfast time the next day. Miller's mother became concerned first when he did not show up to retrieve the children, and more so when no one answered her telephone calls. Miller's mother drove to Miller's home on multiple occasions, and each time the house was locked and no one answered the door. Miller's mother also noticed that Miller's wife's vehicle was missing. *Id.*

Miller's mother was not able to contact either Miller or his wife for the rest of the day. On the following day, Miller's mother contacted the wife's mother, who also had not heard from Miller's wife. Concerned, Miller's wife's mother filed a missing person's report. The Pennsylvania Supreme Court explained the subsequent events as follows:

> In response to this report, the investigating trooper contacted the employers for Miller and his wife, checked with local prisons and hospitals, and interviewed family members. Both [Miller's mother] and [Miller's wife's mother] related to the police that Miller and his wife had used illicit drugs and speculated that they might have travelled to Philadelphia to purchase drugs. The police also went to the Miller home, knocked on the door, and after receiving no response, checked the doors, finding them locked. When these efforts failed, the troopers asked [Miller's mother] to meet them at the residence. Once there, [Miller's

> mother] again expressed concern that something may have happened to her son and daughter-in-law because of their history of drug abuse. The troopers who met [Miller's mother] were familiar with the Millers' drug problem and were aware of Miller's history of spousal abuse. At [Miller's mother's] request, and after receiving assurance from her that she would be responsible for the property, the troopers agreed to forcibly enter the residence.

*Id.* at 897-98. The troopers entered the home through a basement window. In a bedroom, they found Miller's wife, who had been forcibly raped and then stabbed to death. *Id.* at 898. Based upon these extensive circumstances, the Court held that the police constitutionally were permitted to enter the home pursuant to the immediate aid exception. *Id.* at 900.

Our Supreme Court applied the exception more recently in **Commonwealth v. Galvin**. In that case, police officers stopped a van being driven by Galvin because one of the van's headlights was not illuminated. **Galvin**, 985 A.2d at 786. After stopping the van, one of the police officers observed a human leg protruding from a white sheet in the back of the van. The officer also noticed that a piece of plastic had broken off of the van's bumper. *Id.*

Upon closer inspection, the police discovered the body of a large white male wrapped in a bloody white sheet, and secured with yellow electrical cord. After arresting Galvin, officers noted that Galvin's pant leg, boot, watch, and glasses were spotted with human blood. *Id.* at 786-87. From Galvin's driver's license, the police were able to ascertain Galvin's address. Another police officer was dispatched to the residence to look for the piece of

plastic that had broken off of the van's bumper. When that officer arrived at the residence, he noticed a fresh trail of blood leading from the sidewalk to the front door. The officer also located a wooden broom with blood on it. Based upon these observations, and most notably because the trail of blood appeared to lead from the sidewalk into the house, the officer feared that other victims might be inside of the residence and might be in need of immediate medical aid. The officer called for assistance. *Id.*

When the assisting team arrived, they first knocked on the front door, and received no answer. However, after knocking a second time, the officers heard a muffled voice coming from inside the residence. They immediately forced entry into the home and performed a sweep inside. Inside, they found Galvin's father, who was not in need of medical assistance. However, the officers found bullet casings and blood on the floor of Galvin's bedroom. The piece that had broken off of the bumper was found on the curb near the front of the home. *Id.*

Citing *Mincey*, *Miller*, and *Silo*, our Supreme Court held that the fresh trail of blood and the muffled voice were sufficient to demonstrate an objectively reasonable basis for the officers to conclude that someone was inside Galvin's residence and in need of immediate aid. Thus, the Court upheld the warrantless entry into the home. *Id.* at 795-96.

Finally, in *Potts*, a panel of this Court upheld the application of the immediate aid exception to the following circumstances, as summarized by the panel:

- 13 -

> In this case, police officers responded to a 911 call for an alleged domestic dispute involving someone screaming at [Potts'] apartment building. Upon arriving at the location, the officers heard the screams emanating from [Potts'] apartment. As observed by the trial court, this not only corroborated the report of screaming in the distress call, but indicated that it had been going on "for quite some time." The officers announced themselves, knocked on [Potts'] apartment door, and the screaming stopped within seconds. After knocking and announcing several more times over approximately ten seconds, [Potts' fiancée] opened the door. [She] was "very distraught," "appeared to be crying," was sweating although it was a cold day in January, her breathing was "really heavy," and her clothes were "disheveled."
>
> From the open doorway, the officers saw [Potts] run into a bedroom directly behind the living room, shutting the door behind him. [Potts' fiancée] then walked into the living room, leaving the front door to the apartment open. Concerned for her safety, the officers followed [her] into the apartment to ensure that she was not in danger.

*Potts*, 73 A.3d at 1281 (citations to the notes of testimony omitted). Once inside, the police conducted a protective sweep of the apartment, during which the police observed marijuana. This Court held that the totality of the circumstances justified the police entry into the home both to ensure that Potts' fiancée was not in any further danger and to determine whether she was in need of immediate aid. *Id.*

Upon considering the facts of these precedential decisions, it becomes apparent to me that the circumstances leading up to the warrantless entry into Brill's home in the case *sub judice* do not exhibit a similar immediacy as was exhibited in those case. The indicia of immediacy in those cases simply are not present here. Ms. Brill had not been missing for days, nor had anyone observed any disruption in her normal routine. Ms. Brill had not

missed work or any scheduled appointments. Her absence had not been noted for a significant period of time; indeed, the evidence did not establish that her absence lasted any longer than that very morning. She did not go days without picking up her children. No witnesses overheard arguments, screams, disturbances, or other unusual events. There were no reports of domestic violence, verbal or mental abuse, or excessive drug use. Of course, there was no trail of blood or dead bodies.

Although Ms. Baumer reported to Officer Nipper that Ms. Brill had suffered from recent fainting spells, there was no indication that Ms. Brill had fainted that particular morning. As noted above, the circumstances that permit a warrantless entry into a home are circumscribed narrowly, and are justified only in very limited circumstances. The immediate aid exception applies only when there is an objectively reasonable basis to conclude that someone is in **immediate** need of medical attention; it simply does not apply, without more concrete information, to general concerns for safety. I certainly do not mean to downplay Ms. Baumer's concern for her sister's well-being, but the genuineness of concern is not cause to extend the application of the immediate aid exception to circumstances that do not exhibit the immediacy necessary to bypass the constitutionally foundational warrant requirement. Here, the entry into Brill's home lacked those necessary circumstances.

Consequently, while the record supports the trial court's factual findings, the legal conclusions that the trial court drew therefrom were

erroneous. Additionally, because the subsequent consent searches were direct descendants of the initial unconstitutional entry, with no intervening and independent circumstances, those searches necessarily suffer from the original taint. *See Commonwealth v. Freeman*, 757 A.2d 903, 909 (Pa. 2000). Thus, I would reverse the court's order denying Brill's suppression motion, vacate the judgment of sentence, and remand for any further proceedings.[6]

Because the Majority concludes otherwise, I dissent.

---

[6] Because of the disposition that I would reach, I would not address Brill's second listed issue.