J-S64027-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JAMES H. SHRIEVES | |
| Appellant | No. 346 MDA 2015 |

Appeal from the Judgment of Sentence of January 21, 2015
In the Court of Common Pleas of Lancaster County
Criminal Division at No.: CP-36-CR-0003090-2013

BEFORE: FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.*

MEMORANDUM BY WECHT, J.:                    **FILED DECEMBER 16, 2015**

James Shrieves appeals the January 21, 2015 judgment of sentence. We affirm.

The trial court set forth the following factual and procedural history of this case:

> On June 1, 2013, at approximately 5:15 a.m., Officer [Thomas] Cole of the Lancaster City Police Department responded to a cardiac arrest call at [Shrieves'] residence. Upon arrival, Officer Cole went to the second floor where [Shrieves'] fiancée, [Anika] Munoz, was located and observed EMTs attempting to revive her using CPR. Another officer at the scene, Officer Berry,[1] interviewed [Shrieves] to obtain basic information and information about the incident. During the conversation, [Shrieves] appeared concerned, but he was coherent and able to answer all of the officer's questions and convey pertinent medical information about Ms. Munoz. Eventually, medical personnel decided that Ms. Munoz would be transported to

_____

*        Former Justice specially assigned to the Superior Court.

1        Officer Berry's first name does not appear in the certified record.

Lancaster General Hospital, and she was put into an ambulance. At that point, the EMTs asked [Shrieves] to gather all of Ms. Munoz' medications.

[Shrieves] took a plastic bag, went into the bedroom, opened a cabinet, and began gathering pill bottles for Ms. Munoz. At this point, Officer Cole was about three feet behind [Shrieves] in the second floor bedroom. While [Shrieves] was gathering the pill bottles, Officer Cole observed a small black and silver scale inside the medicine cabinet. [Shrieves] was advised that the ambulance would not wait for him, and that he would have to leave soon if he wanted to ride in the ambulance. [Shrieves] then walked over to a small nightstand to reach a smaller shelf behind it and picked up a large baggie containing multiple smaller baggies containing white objects inside of them. Officer Cole was about two or three feet away and was able to observe [Shrieves'] actions and the baggie. Officer Berry was standing right next to [Shrieves] and [Shrieves] grabbed the baggie and closed his hand around it, concealing the entire bag except for a small portion. Officer Cole asked [Shrieves] what was in his hand, and [Shrieves] immediately dropped the bag into a purse in front of him and picked up a set of keys. He told Officer Cole that he just had keys in his hand.

Officer Cole then looked into the purse, which was open, and saw the baggie lying right on top of the contents of the purse. Based on the officer's twelve years of experience, he believed the bag contained cocaine. Officer Cole recovered the bag, confirmed that there were twenty-one individually packed smaller bags, and searched [Shrieves] for any other contraband. [Shrieves] asserted that neither he nor Ms. Munoz used crack cocaine or cocaine. Given the circumstances of Ms. Munoz' medical condition, [Shrieves] was not placed under arrest, but rather allowed to go to the hospital to be with his fiancée and her family. Officer Cole then waited at [Shrieves'] residence to secure the scene until Officer [Andrew] Nauman arrived.

Trial Court Opinion ("T.C.O."), 2/12/2014, at 1-3 (citations to the certified record omitted; minor modifications for clarity).

Officer Cole went back to the police station, taking the bag of suspected cocaine with him, and Officer Nauman proceeded to secure the

residence. Detective Kurtis Miller met Shrieves at Lancaster General Hospital and spoke with him in a private conference room. Shrieves gave Detective Miller written consent to search his residence.

Detective Miller went to Shrieves' home and informed Officer Nauman that Shrieves had given him consent to search the premises. Officer Nauman began searching Shrieves' bedroom and discovered a Glock .40-caliber handgun in a dresser drawer. At that point, he and Detective Miller stopped the search and obtained a warrant to continue searching the home. In addition to the firearm, Detective Miller found ammunition and multiple pieces of drug paraphernalia throughout the home. He also learned that the Glock found in Shrieves' dresser had been reported stolen.

On June 3, 2013, Shrieves was arrested and charged with possession of a controlled substance with intent to deliver ("PWID"), possession of drug paraphernalia, persons not to possess firearms, and receiving stolen property.[2] On September 10, 2013, Shrieves filed a motion to suppress the physical evidence seized from his home. Therein, Shrieves argued, *inter alia*, that Officer Cole illegally seized baggies of crack cocaine from Shrieves' residence on June 1, 2013. Following a hearing, the trial court denied Shrieves' suppression motion on February 12, 2014.

After the trial court, *sua sponte*, severed the persons not to possess firearms count from the information, Shrieves proceeded to a jury trial on

_____

[2] 35 P.S. §§ 780-113(a)(30), and 780-113(a)(32); 18 Pa.C.S. §§ 6105(a)(1), and 3925, respectively.

that charge alone on November 12, 2014. On November 13, 2014, the jury found Shrieves guilty of persons not to possess a firearm. Shrieves then proceeded to a bench trial on the remaining charges. On January 21, 2015, the trial court found Shrieves guilty of PWID and possession of drug paraphernalia. On that same day, the trial court sentenced Shrieves to four to eight years' imprisonment for persons not to possess a firearm and eighteen to thirty-six months' imprisonment for PWID, which the trial court imposed concurrently.

On February 20, 2015, Shrieves filed a notice of appeal. On March 10, 2015, the trial court ordered Shrieves to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Shrieves timely complied. On April 17, 2015, the trial court filed a Pa.R.A.P. 1925(a) opinion.

Shrieves presents one issue for our consideration:

Did police exceed their right to enter Shrieves' residence pursuant to a 9-1-1 call for medical assistance after they discovered the emergency was being handled by EMTs, and unlawfully remain there after the ambulance had transported the patient; thus, were [*sic*] contraband observed when police entered Shrieves' bedroom, and evidence seized pursuant to a consent search the fruit[s] of police illegally entering and remaining in the residence, and should this evidence have been suppressed?

Brief for Shrieves at 4 (minor modifications for clarity).

In addressing a challenge to a trial court's denial of a suppression motion, we are limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the

Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Brown*, 64 A.3d 1101, 1104 (Pa. Super. 2013) (citation omitted). Our scope of review in suppression matters includes only the suppression hearing record, and excludes any evidence elicited at trial. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013).

The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). To resolve this case, we must discuss two such exceptions.

The first exception, the emergency aid exception, applies when "police reasonably believe that someone within a residence is in need of immediate aid." *Commonwealth v. Galvin*, 985 A.2d 783, 795 (Pa. 2009); *see also Mincey v. Arizona*, 437 U.S. 385, 392 (1978) ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."). The rationale for this exception is that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be

otherwise illegal absent an exigency or emergency." **Mincey**, 437 U.S. at 392 (quoting **Wayne v. United States**, 318 F.2d 205, 212 (D.C. Cir. 1963)).

The second exception to the Fourth Amendment that is applicable in this case, the plain view doctrine, permits police to seize an object without a warrant when: "(1) an officer views the object from a lawful vantage point; (2) it is immediately apparent to him that the object is incriminating; and (3) the officer has a lawful right of access to the object." **Commonwealth v. Miller**, 56 A.3d 424, 429 (Pa. Super. 2012) (citing **Commonwealth v. Brown**, 23 A.3d 544 (Pa. Super. 2011) (*en banc*)).  Because the doctrine requires police to be lawfully present in an area when they observe the contraband, the plain view "exception" perhaps is best understood not as an exception to the Fourth Amendment at all.  The plain view doctrine merely acts as an extension of some other justification, which gave the police a "lawful right of access" to the object in the first instance.  **See Commonwealth v. Graham**, 721 A.2d 1075, 1079 (Pa. 1998) ("[U]nder the Fourth Amendment, an officer may not seize contraband in plain view unless a prior justification provided the officer a lawful 'right of access to the item.'").  Thus, although the case *sub judice* implicates the plain view doctrine, we first must determine whether the emergency aid exception justified Officer Cole's presence in Shrieves' home at the time of the seizure.

The United States Supreme Court first recognized the emergency aid exception to the Fourth Amendment's warrant requirement in **Mincey**.  In

that case, an undercover police officer arranged to purchase heroin at an apartment, and arrived with nine additional plainclothes officers. The lead officer slipped into the apartment and quickly moved into the bedroom. The other officers heard a "rapid volley of shots," and saw the lead officer collapse onto the floor. *Id.* at 387. He died a few hours later.

After the shooting, the officers performed a cursory search for additional victims, but refrained from any further investigation. They found four other injured persons in the apartment, and requested emergency assistance. Within ten minutes, homicide detectives arrived and undertook an "exhaustive and intrusive" warrantless search of the apartment, which lasted four days. *Id.* at 389. The detectives opened drawers, closets, and cabinets, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them. The detectives closely examined and inventoried every item in the apartment. They seized over 200 items.

The *Mincey* Court began by acknowledging that "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id.* at 392. Nevertheless, the Court cautioned that a warrantless search "must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id.* at 393 (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26 (1968)). In refusing to apply the emergency aid exception under these circumstances, the Court emphasized that the first team of officers had

already located all of the victims in the apartment before the homicide detectives had even arrived to begin their search. The Court explained that the four-day search, which included ripping up carpets, could "hardly be rationalized in terms of the legitimate concerns that justify an emergency search." *Id.* at 393.

There can be little doubt that the facts of the case *sub judice* warrant application of the emergency aid exception. The relevant inquiry is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Commonwealth v. Potts*, 73 A.3d 1275, 1280 (Pa. Super. 2013) (quoting *Michigan v. Fisher*, 558 U.S. 45, 49 (2009)). Shrieves does not dispute that his 911 call, wherein he reported that his fiancée had suffered cardiac arrest, gave the police an objectively reasonable basis for believing that medical assistance was needed. *See* Brief for Shrieves at 17. Instead, Shrieves argues that, once "Ms. Munoz was removed to the ambulance, there was no longer any basis for the police to remain in the residence while [Shrieves] collected Ms. Munoz' medication." *Id.* We disagree.

The question of whether Ms. Munoz' medical emergency had dissipated before Officer Cole observed Shrieves attempting to conceal baggies of crack cocaine is crucial to resolving this case. If Officer Cole's presence in the home was no longer justified by the emergency aid exception, then the plain view doctrine does not apply. *See Mincey*, 437 U.S. 385, 393 (1978) ("[T]he police may seize any evidence that is in plain view during the course

of their legitimate emergency activities."); *Graham*, 721 A.2d at 1079 ("[U]nder the Fourth Amendment, an officer may not seize contraband in plain view unless a prior justification provided the officer a lawful 'right of access to the item.'").

> A warrantless search must be strictly circumscribed by the exigencies which justify its initiation. As to what may be done by the police or other public authorities once they are inside the premises, this must be assessed upon a case-by-case basis, taking into account the type of emergency which appeared to be present. . . . The officer's post-entry conduct must be carefully limited to achieving the objective which justified the entry—the officer may do no more than is reasonably necessary to ascertain whether someone is in need of assistance and to provide that assistance.

3 Wayne R. LaFave, *Search and Seizure* § 6.6(a) (5th ed. 2012) (footnotes and internal quotation marks omitted).

Instantly, the medical emergency had not yet dissipated when Officer Cole observed in plain view Shrieves attempting to conceal baggies of crack cocaine. While the EMTs attempted to resuscitate Ms. Munoz in the bedroom, Shrieves spoke with police in the hallway. He relayed to the police Ms. Munoz' basic demographic information, her symptoms, her medical history, and the name of her physician. As the EMTs moved Ms. Munoz out to the ambulance, one of them asked Officer Cole and Shrieves about Ms. Munoz' current prescriptions. Shrieves said that he would gather Ms. Munoz' medication bottles. Officer Cole followed Shrieves into the bedroom and told him that he needed to hurry if he wanted to go to the hospital in the ambulance. When Officer Cole saw Shrieves discard crack cocaine, he asked

Shrieves "if Ms. Munoz, by chance, used drugs at all." Notes of Testimony, 12/6/2013, at 16. Officer Cole told Shrieves that "it was important for [the] EMTs to know" if Ms. Munoz had used any controlled substances, and that it would help them treat her. *Id.* Officer Cole did not arrest Shrieves at that time.

When responding to emergencies such as this one, police, fire, and medical personnel must act swiftly and efficiently. It is reasonable to expect that EMTs might depend upon responding police officers to collect vital information needed to accurately diagnose and treat the patient. That is exactly what happened in this case. Unlike in ***Mincey***, *supra*, where the police undertook an exhaustive warrantless search, which lasted four days, Officer Cole's conduct was limited to assisting the EMTs during a medical emergency. Accordingly, we reject Shrieves' argument that Officer Cole was not legally present in Shrieves' bedroom when he seized the crack cocaine.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2015

- 10 -