J-A17004-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| CASSANDRA GOOD | : | |
| Appellant | : | No. 229 WDA 2017 |

Appeal from the Judgment of Sentence January 9, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0011540-2016

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                    FILED OCTOBER 31, 2018

Cassandra Good appeals from the judgment of sentence imposed January 9, 2017, in the Allegheny County Court of Common Pleas.  The trial court sentenced Good to an aggregate term of two years' probation, following her non-jury conviction of persons not to possess firearms (two counts), and possession of an electronic incapacitation device.[1]  On appeal, she argues: (1) the trial court erred in admitting evidence seized during an unauthorized warrantless search;  (2) her convictions were against the weight of the evidence;  and (3) the trial court improperly denied her petition to have counsel present during her presentence interview.  For the reasons below, we affirm.

_____

[1] See 18 Pa.C.S. §§ 6105(a)(1) and 908.1(c).

The relevant facts, as developed during the suppression hearing, are as follows. On August 6, 2015, at approximately 6:40 p.m., Allegheny County Detective Stephen Hitchings, along with at least nine other city and county officers and state parole agents, arrived at 2927 Shadeland Avenue in Pittsburgh to serve an arrest warrant on Joshua Strayhorn for the crime of unauthorized use of a vehicle. See N.T., 5/16/2016, at 29, 44. Strayhorn was also a suspect in a homicide investigation. See id. at 44. Although he did not live at the Shadeland Avenue address, Strayhorn's ankle monitor placed him in the area,[2] and undercover officers verified he entered the residence on the night in question. See id. at 49.

Detective Hitchings approached the door with "at least" one other officer. See id. at 49. The testimony is unclear where the remaining city and county officers were located, although at least one, County Detective Michael Caruso, testified he was positioned "on the side of the house." Id. at 23. See also id. at 48 (Detective Hitchings testifying "[t]here were a lot" of police officers with him when he executed the arrest warrant). Detective Hitchings testified he knocked on the door, which was answered by Good, and she "invited [them] into the house." Id. at 50. He explained:

> [Good] was informed we had a warrant for Joshua Stayhorn. She indicated he was in the residence, and while I was speaking with her[,] he appeared from the kitchen area, and he was taken into custody.

_____

[2] Strayhorn was on state parole at the time. See N.T., 5/16/2016, at 49.

- 2 -

Id. at 46. Strayhorn was immediately removed from the home. See id. at 51. Detective Hitchings observed two young men sitting in the living room. He then asked Good "if anyone else was in the residence, and at that time she granted us permission to look in the residence for any other people." Id. at 46. He described his interaction with Good as follows:

> It was cordial. I explained everything to her. She had very few questions, and she was very agreeable with what I requested.

Id. at 47. Detective Hitchings testified that when he asked to search the residence he was not "looking for anything," but rather, claimed it was "a matter of officer safety." Id. at 51. He explained:

> I didn't want to leave the residence and get shot at by people from the second floor window, and we were concerned about that because of the people associated with that neighborhood.

Id. at 52-53. See also id. at 81 (Pittsburgh Police Officer Paul Abel testifying that the neighborhood is a "high crime area ... known for open drug use and open drug dealing, as well as violent crimes involving the use of firearms and homicides.").

At that time, multiple officers began to search the residence. Pittsburgh Police Officer Joseph Barna proceeded to the basement, where he observed co-defendant Derrick Thompson sitting in a DJ booth. On the table in front of Thompson was a firearm and marijuana. See id. at 69-70, 74. Officer Barna then detained Thompson and took him upstairs. As he was doing so, he observed "a [firearm] magazine protruding from an open void in the rafters and the roof." Id. at 71. He reported what he observed to Pittsburgh Police

Officer Paul Abel, who then obtained a search warrant. See id. at 82-83. Officer Abel testified he observed bricks of heroin in the ceiling next to the firearm. See id. at 82.

While Officer Barna searched the basement, County Detective Michael Caruso, along with another detective, accompanied Good up to her bedroom on the second floor of the residence so they could speak in private. See id. at 24, 27. Detective Caruso "advised [Good they] were looking for Mr. Stayhorn regarding a homicide, and [] specifically were looking for a .40-caliber handgun and/or live rounds." Id. at 25. They provided her with a consent to search form, on which they wrote down "exactly what [they] were looking for," which she then signed. Id. In the meantime, Detective Hitchings had been searching the second floor for individuals, when he encountered a locked door leading to the third floor. He asked Good for the key, which she provided. In the room on the third floor, the detective observed cocaine in plain view. See id. at 54-55. Upon execution of the search warrant, the officers recovered the aforementioned firearms, a large quantity of heroin in the basement and third floor bedroom, drug paraphernalia and a stun gun in the basement, and nearly $7,500 in cash from Good's bedroom. Additionally, a small amount of marijuana was found in Good's purse. See N.T., 9/28-9/30/2016, at 119-127, 163-165, 181, 184.

Good was subsequently arrested and charged with persons not to possess firearms (two counts), possession of an electronic incapacitation device, criminal conspiracy, possession with intent to deliver controlled

substances, possession of controlled substances, possession of a small amount of marijuana, and possession of drug paraphernalia.[3] Thompson, who was sitting in the DJ booth, and Reginald Good, Good's son who lived in the third floor bedroom, were also arrested and charged with similar offenses. In May of 2016, Good filed an omnibus pretrial motion, followed by an amended motion, seeking, inter alia, suppression of the physical evidence recovered from her home. A suppression hearing was held on May 16, 2016. The trial court denied the motion on September 28, 2016. The gun charges were severed from the drug and conspiracy charges, and given a new docket number. Thereafter, the drug and conspiracy charges proceeded to a jury trial at Docket No. 15857-2015. On October 3, 2016, the jury acquitted Good of all offenses, except for possession of a small amount of marijuana. That same day, the trial court considered the gun charges at Docket No. 11540-2016, and found Good guilty of two counts of persons not to possess a firearm and one count of possession of an electronic incapacitation device.

On December 21, 2016, Good's attorney filed a petition seeking permission to attend her presentence investigation interview ("PSI"). The court denied the petition by order dated December 29, 2016. Thereafter, on January 9, 2017, Good was sentenced to concurrent terms of two years' probation on the firearms charges, a concurrent term of nine months'

_____

[3] See 18 Pa.C.S. §§ 6105(a)(1), 908.1(c), and 903, and 35 P.S. §§ 780-113(a)(30), (a)(16), (a)(31) and (a)(32).

probation for possessing a stun gun, and a concurrent term of 30 days' probation for possession of a small amount of marijuana.[4]

On February 1, 2017, Good filed a timely notice of appeal at Docket No. 11540-2016 (the gun charges). On March 24, 2017, the trial court directed her to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Good complied with the court's directive, and filed a concise statement on April 11, 2017, listing both docket numbers on the document.[5] The court then filed a Pa.R.A.P. 1925(a) opinion on June 21, 2017. Thereafter, on July 28, 2017, Good filed an amended notice of appeal in the trial court, listing both Docket Nos. 11540-2016 and 15857-2015.

Before we consider the substantive issues on appeal, we must first address Good's amended notice of appeal. It is well-settled that, when no timely post-sentence motion is filed, a notice of appeal in a criminal case must be filed within 30 days of the imposition of sentence. See Pa.R.Crim.P.

---

[4] On April 25, 2017, the trial court entered a "Corrected Order of Sentence" at Docket No. 15857-2015. Because, as discussed below, that conviction is not before us, we need not determine whether the trial court had jurisdiction to modify or correct the sentence more than 30 days after it was imposed. See Commonwealth v. Walters, 814 A.2d 253, 256 (Pa. Super. 2002) (stating that "where [a] mistake is patent and obvious" trial courts have the power to correct or alter a criminal sentence "even though the 30-day appeal period has expired"), appeal denied, 831 A.2d 599 (Pa. 2003).

[5] We note Good filed an amended concise statement on July 21, 2017, after the trial court filed its opinion. The only change we can identify in the amended statement is that it lists only Docket No. 11540-2016.

720(a)(3). Here, Good filed a timely notice of appeal on February 1, 2017, but listed only Docket No. 11540-2016, which disposed of the gun charges. Apparently realizing her mistake, Good filed an amended notice of appeal on July 28, 2017, listing both criminal Docket Nos. 11540-2016 and 15857-2015, which disposed of the drug charges. She did so, however, without leave of court. Therefore, Good failed to file a timely notice of appeal from her conviction of possession of a small amount of marijuana at Docket No. 15857-2015. Accordingly, our disposition applies only to the charges at Docket No. 11540-2016.[6]

In her first issue on appeal, Good contends the trial court erred in admitting evidence seized during an unauthorized search of her residence. See Good's Brief at 18-29. When considering a trial court's order denying a motion to suppress evidence, our standard of review is as follows:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression

_____

[6] Significantly, Good lists only Docket No. 11540-2016 on her appellate brief to this Court.

court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

Commonwealth v. Freeman, 150 A.3d 32, 34–35 (Pa. Super. 2016) (quotation omitted), appeal denied, 169 A.3d 524 (Pa. 2017).

Preliminarily, we note that at the conclusion of the suppression hearing, the court did not enter "on the record a statement of findings of fact and conclusions of law" as required by Pennsylvania Rule of Criminal Procedure 581(I). In such a case, we "are constrained to focus our review" on the trial court's Pa.R.A.P. 1925(a) opinion. Commonwealth v. Reppert, 814 A.2dd 1196, 1200 (Pa. Super. 2002) (en banc). See also Commonwealth v. Millner, 888 A.2d 680, 685 (Pa. 2005) ("When the suppression court's specific factual findings are unannounced, ... the appellate court should consider only the evidence of the prevailing suppression party (here, [the Commonwealth]) and the evidence of the other party (here, [Good]) that, when read in the context of the entire record, remains uncontradicted.").[7]

In the present case, the court addressed its suppression ruling in its Pa.R.A.P. 1925(b) opinion as follows:

Consent is an intentional relinquishment of a "known right[.]" Commonwealth v. Gibson, 638 A.2d 203, 207 (Pa., 1994). Thus, the subject of the search must be shown to have

_____

[7] We emphasize to the trial court that the proper, and better, practice is to enter specific findings of fact and conclusions of law when announcing the denial of a suppression motion, particularly where, as here, the decision hinges on a close credibility determination. See Pa.R.Crim.P. 581(I).

- 8 -

made some affirmative action in giving consent. Commonwealth v. Cleckley, 738 A.2d 427 (Pa. 1999). Here the testimony clearly showed that [Good] was asked if the police could go through her home, and she approved without objection. The police conducted a protective sweep because of the size of [Good's] home and the number of males who were seen near the target of the arrest warrant. The Supreme Court has upheld the search as a permissible "protective sweep" incident to the arrest of persons in the house. Commonwealth v. Waltson, 724 A.2d 289 (P[a]. 1998). While defense counsel argues that there are no circumstance[s] that warrant the protective search, the evidence showed that the suspect came from a different part of the home, a large number of officers were[] in the home to arrest someone wanted for [h]omicide and an unknown number of males were scattered throughout the house. Co[-]defendant, Derrick Thompson was found in the basement in close proximity to a firearm, later identified as a loaded 9mm Beretta. It was only after contraband was observed in plain view and the house was secured that Officer Able obtained a search warrant. Furthermore, as pertaining to [Good's] argument that the Commonwealth fails to, "assert any other warrant exception to permit the search," ... [t]estimony by Agent Barna was that the contraband [was] in plain view. Under the 4th Amendment police may seize evidence without a warrant if it is in plain view, its incriminatory character is immediately apparent, and the officer is lawfully in the place where the seizure was made. Horton v California, 496 US 128 (1190); Commonwealth v Arnold, 932 A.2d 143 (Pa. Super, 2007), US v Davis, 690 F.3d 226 (4th Cir., 2012). The officers in the case at bar took the extra precaution of getting a search warrant for the evidence they found in plain sight. For these reasons, the evidence was lawfully obtained.

Trial Court Opinion, 6/22/2017, at 4-5 (record citations omitted).

The trial court provided several reasons for denying Good's motion to suppress: (1) the officers conducted a "protective sweep" of the premises; (2) Good voluntarily consented to the search; and (3) the firearms recovered from the basement were in plain view. We will consider these contentions seriatim.

- 9 -

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others[,]" which is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990). See Commonwealth v. Taylor, 771 A.2d 1261 (Pa. 2001) (approving of protective sweep under Buie),[8] cert. denied, 534 U.S. 994 (2001). This Court has interpreted Buie as approving two levels of protection:

> Pursuant to the first level of a protective sweep, without a showing of even reasonable suspicion, police officers may make cursory visual inspections of spaces immediately adjacent to the arrest scene, which could conceal an assailant. The scope of the second level permits a search for attackers further away from the place of arrest, provided that the officer who conducted the sweep can articulate specific facts to justify a reasonable fear for the safety of himself and others.

Commonwealth v. Potts, 73 A.3d 1275, 1281–1282 (Pa. Super. 2013) (quotation omitted), appeal denied, 83 A.3d 415 (Pa. 2013).

Here, the drugs and firearms were observed when officers searched the basement and a locked third floor bedroom. Detective Hitchings testified that immediately after he informed Good he had an arrest warrant for Strayhorn, Strayhorn "appeared from the kitchen area, and he was taken into custody." N.T., 5/16/2016, at 46. Therefore, the kitchen area, and at most the first

---

[8] Although Taylor was a plurality decision, both the opinion announcing the judgment of the court ("OJAC") and the concurring and dissenting opinion applied the two levels of protection announced in Buie, albeit to different results. See Taylor, supra, 771 A.2d at 1273 (OAJC by Newman J. finding protective sweep of basement valid), and at 1274-1275 (concurring and dissenting opinion by Nigro, J. finding Commonwealth "failed to present specific and articulable facts necessary to justify a protective sweep").

- 10 -

floor, were spaces "immediately adjacent to the arrest scene" where the police could have conducted a "protective sweep" without any showing of reasonable fear for their safety. Potts, supra, 73 A.3d at 1282. However, the areas searched in Good's home were significantly "further away from the place of arrest," and our review of the record reveals Detective Hitchings did not "articulate specific facts to justify a reasonable fear for the safety of himself and others." Id. Although Strayhorn was a suspect in a homicide, Detective Hitchings provided no basis to suspect that the murder weapon would be in Good's home. Rather, he claimed the search was conducted "for [officer] safety." N.T., 5/16/2016, at 52. He explained: "I didn't want to leave the residence and get shot at by people from the second floor window, and we were concerned about that because of the people associated with that neighborhood." Id. at 52-53. The detective did not, however, provide any specific facts to justify his suspicion that he and the numerous other officers at the scene might be "shot at" when leaving the residence. Id.

Furthermore, the evidence cited by the trial court to justify a second level protective search is also insufficient. The court noted first the protective sweep was conducted because of "the size of [Good's] home and the number of males who were seen near the target of the arrest warrant." Trial Court Opinion, 6/22/2017, at 4. Next, the trial court emphasized that "the suspect came from a different part of the home, a large number of officers were[] in the home to arrest someone wanted for a [h]omicide and an unknown number of males were scattered throughout the house." Id. at 5. However, these

factual findings by the trial court are not supported by the record. Our review of the transcript from the suppression hearing reveals no testimony regarding the size of Good's home, nor any indication that there might have been males "scattered throughout the house." Id. Detective Hitchings testified that while he was speaking to Good, Strayhorn appeared from the kitchen area, and that he observed two young men sitting in the living room. At most, this testimony would have supported a "protective sweep" of the first floor. Without any specific facts to substantiate a reasonable fear for the officers' safety, we find the extended search of the basement and third floor was not justifiable as a "protective sweep."[9]

The trial court also found, however, Good voluntarily consented to the search of her home. It is well-established that a warrantless search is "constitutionally impermissible, unless an established exception applies." Commonwealth v. Strickler, 757 A.2d 884, 888 (Pa. 2000). "One such exception is consent, voluntarily given." Id. When considering the voluntariness of a consent to search, the burden is on the Commonwealth to establish "that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." Id. at 901.

_____

[9] We note the Commonwealth does not even attempt to argue the officers' search of Good's residence constituted a permissible "protective sweep" in its appellee brief. Rather, it focuses on the court's determination that Good voluntarily consented to the search. See Commonwealth's Brief at 18-23.

- 12 -

"The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent." Commonwealth v. Reid, 571 Pa. 1, 811 A.2d 530, 549 (2002). Such evaluation includes an objective examination of "the maturity, sophistication and mental or emotional state of the defendant...." Strickler, 757 A.2d at 901. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation. See Commonwealth v. Cleckley, 558 Pa. 517, 738 A.2d 427, 433 (1999) ("one's knowledge of his or her right to refuse consent remains a factor in determining the validity of consent ..." and whether the consent was the "result of duress or coercion.").

Commonwealth v. Smith, 77 A.3d 562, 573 (Pa. 2013).[10]

_____

[10] The following non-exclusive list of factors may be relevant in determining the legality of a consensual search:

(1) the presence or absence of police excesses;

(2) physical contact or police direction of the subject's movements;

(3) the demeanor of the police officer;

(4) the location of the encounter;

(5) the manner of expression used by the officer in addressing the subject;

(6) the content of the interrogatories or statements;

(7) whether the subject was told that he or she was free to leave; and

(8) the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will).

In the present case, Good argues "any alleged consent [she gave to Detective Hitchings] was involuntary, given that about two-dozen, armed, uniformed officers were surrounding her home, demanding to enter ... [and] no evidence indicates she signed a permission to search form."[11] Good's Brief at 24. For support, she relies upon an unpublished memorandum decision of this Court. See Commonwealth v. Collier, 100 A.3d 314 (Pa. Super. 2014) (unpublished memorandum).

First, we agree with the Commonwealth's assertion that Good's description of "two-dozen, armed, uniformed officers"[12] demanding to enter her home is not supported by the testimony presented during the suppression hearing. See Commonwealth's Brief at 19. Although Detective Hitchings testified there were "a lot" of officers on the scene, none of the witnesses at the suppression hearing, including Good herself, estimated the number of law enforcement officers to be anywhere near 24. See N.T., 5/16/2016, at 29,

_____

Commonwealth v. LaMonte, 859 A.2d 495, 500 (2004), citing Strickler, supra, 757 A.2d at 897-898, 901.

[11] In its opinion, the trial court did not rely upon the written consent form to evaluate the legality of the search. Indeed, the weapons recovered from the basement were observed by Officer Barna while he searched the basement for other persons based upon Good's verbal consent. Nevertheless, we note that contrary to Good's contention, a copy of the written consent form was introduced into evidence during the suppression hearing. See N.T., 5/16/2016, at 26.

[12] Good's Brief at 24.

- 14 -

62, and 93.[13]  Furthermore, it is unclear from the testimony where the officers were positioned when Detective Hitchings requested Good's consent to search the home.  However, at least two officers indicated they were not at the front door at that time.  See id. at 23 (Detective Caruso was positioned "on the side of the house"); 81 (Officer Paul Abel entered the residence after Officer Barna observed a firearm in the basement).

Second, with regard to the verbal consent to search, Detective Hitchings testified when Strayhorn was taken into custody, he observed two young men sitting in the living room, so he "asked [Good] if anyone else was in the residence, and at that time she granted us permission to look in the residence for any other people."  Id. at 46.  When asked to describe his interaction with Good, Detective Hitchings stated:

> It was cordial.  I explained everything to her.  She had very few questions, and she was very agreeable with what I requested.

Id. at 47.  He later explained:  "She was cordial and respectful and understanding, and she allowed us to continue to search the residence for other people."  Id. at 54.  Although, as noted above, the court did not set forth specific credibility determinations, it is evident the court found the testimony  of Detective Hitchings credible because the court concluded  Good "was asked if police could go through her home, and she approved without

_____

[13] Even though at trial Detective Hitchings estimated there were "probably 20, 25 police" with him on the night in question, our review of a suppression ruling is limited to the evidence presented during the suppression hearing.  N.T., 9/28-30/2016, at 62.  See also Freeman, supra.

objection." Trial Court Opinion, 6/22/2017, at 4. Good, herself, testified the detective never asked for her consent to search, but rather, after the officer took Strayhorn out, "[a]ll of them" entered her home and began to look around. N.T., 5/16/2016, at 93. By concluding Good verbally consented to the search, the court necessarily credited Detective Hitchings' testimony. Based upon our standard of review, we are bound by this factual finding. See Freeman, supra.

We also note Good's reliance on Collier, supra, is misplaced. Unpublished memorandum decisions of this Court have no precedential value.[14] See Commonwealth v. Phinn, 761 A.2d 176, 179 (Pa. Super. 2000), appeal denied, 785 A.2d 89 (Pa. 2001). Furthermore, the circumstances in the present case are not similar to those presented in Collier. Here, immediately after Stayhorn was taken into custody, Detective Hitchings asked Good if the officers could search her home for other persons, and she agreed. There was no delay, and the officers did not begin to search until after she consented. Moreover, the only evidence of coercion was Good's own testimony, which the trial court discredited.

Good also asserts, "assuming arguendo [she] gave consent to search part of this house, she did not give consent to search the basement, which ...

_____

[14] Moreover, an appellant's citation to a memorandum decision of this Court is prohibited "pursuant to this Court's Internal Operating Procedure § 65.37 ("Unpublished Memoranda Decisions)." Commonwealth v. Olson, 179 A3d 1134, 1138 (Pa. Super. 2018), appeal granted, 2018 WL 3752302 (Pa. August 7, 2018).

was essentially an independent part of the house[.]" Good's Brief at 27. She claims she "never used the basement, entered the basement, stored her possessions in the basement, or had any other connection to this subterranean room." Id.

We agree with the Commonwealth's contention that this claim is waived because it was never raised during the suppression hearing. See Commonwealth's Brief at 23. Furthermore, although Good testified that, because of two hip replacements, she only descends to the first floor "once a day" and does not "do the attic or the cellar[,]"[15] there was no testimony the basement was separate from the main house, which would have raised a question as to whether she had authority to consent to a search thereof. See Commonwealth v. Strader, 931 A.2d 630, 634 (Pa. 2007) ("A third party with apparent authority over the area to be searched may provide police with consent to search."). Contrary to Good's argument, the fact that the basement included a DJ booth did not mean Good had no authority over the room.

Accordingly, because the trial court's determination that Good provided verbal consent to Detective Hitchings to search her home for other persons is supported by the record, Good is entitled to no relief on her first claim.[16]

_____

[15] N.T., 5/16/2016, at 94.

[16] We note Good does not dispute the fact that the firearms at issue were discovered in plain view during the initial search for persons. Therefore, we

Next, Good argues the verdict was against the weight of the evidence. Specifically, she asserts the Commonwealth failed to establish she had "constructive possession" of the firearms and stun gun recovered from the basement of the home. Good's Brief at 30. She insists: (1) there was no evidence she knew the weapons were in the house, and no fingerprints or DNA was recovered from the weapons; (2) there were "numerous individuals found in the searched home and several individuals lived there[;]" (3) one firearm and the stun gun were observed in the DJ booth "directly next to" co-defendant Derrick Thompson, who was arrested and convicted of possessing the same contraband; and (4) the testimony, medical records, and photographic evidence "overwhelmingly showed [Good] lacked physical access to the seized items." Id. at 30-32.

Our review of a weight of the evidence claim is well-established: [17]

> The weight of the evidence is a matter exclusively for the finder of fact, who is free to believe all, part, or none of the evidence

_____

need not consider the validity of the written consent form or the execution of the subsequently obtained search warrant.

[17] We disagree with the Commonwealth's assertion that Good's weight claim is waived. See Commonwealth's Brief at 24. Pursuant to Pennsylvania Rule of Criminal Procedure 607(A), a weight of the evidence claim must be first raised before the trial court either "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." Pa.R.Crim.P. 607(A)(1)-(3). A review of the transcript from the sentencing hearing reveals Good's counsel challenged the weight of the evidence orally on-the-record before sentencing. See N.T., 1/9/2017, at 2-5. Accordingly, we find her issue preserved for appellate review.

and to determine the credibility of the witnesses. A new trial is not warranted because of "a mere conflict in the testimony" and must have a stronger foundation than a reassessment of the credibility of witnesses. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. On appeal, our purview is extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence. An appellate court may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

Commonwealth v. Rosser, 135 A.3d 1077, 1090 (Pa. Super. 2016) (en banc), quoting Commonwealth v. Gonzalez, 109 A.3d 711, 723 (Pa. Super. 2015), appeal denied, 125 A.3d 1196 (Pa. 2015) (citations omitted).

The trial court addressed Good's weight claim as follows:

[Good] bases her claim entirely on her medical condition. However, regardless of [her] poor health, credible testimony showed [Good] easily moved between floors, contrary to the testimony of her good friend [], … and [herself]. Furthermore, [Good's] medical records do not say she is incapable of walking steps. [Good] also testified that she is capable of walking up the steps to the second floor, and she told the people in her house she didn't want them bringing guns and drugs into her home. However, earlier she claim[ed] she didn't ever see guns in her house. Her own testimony is contradictory in that she never saw a firearm in her home, yet she told her sons, grandchildren and visitors not to bring guns into her home. Thus, while she may not have personally handled the guns[,] the finder of fact found beyond a reasonable doubt she controlled the weapons found in her house and had knowledge of them.

It was [Good's] home. [Good] had the ability to control the firearm in question.

Trial Court Opinion, 6/22/2017, at 7 (record citations omitted).

We find no abuse of discretion on the part of the trial court in denying Good's weight of the evidence claim. While Good painted herself as an elderly, decrepit woman, the court had the opportunity to observe Good testify, and evaluate her claim that she never entered the basement of her home and, therefore, would have been unaware of any firearms stored therein. The court simply did not find Good's testimony credible. Indeed, although Good claimed she came downstairs only once a day, Detective Hitchings testified he could not recall Good having any "difficulty moving around" on the day in question, and that she followed the officers up to the second floor. N.T., 9/28-30/2016, at 63. Moreover, Officer Barna stated he saw Good on the second floor porch before she answered the door on the first floor "[a]pproximately a minute" later. Id. at 142. Accordingly, the testimony concerning Good's physical ability to move between floors was conflicting, and a matter for the fact finder (here, the trial court) to resolve. Under the facts of this case, we cannot say the trial court abused its discretion in concluding the verdict was not against the weight of the evidence.[18] Accordingly, her second claim fails.

_____

[18] We note the unique context of Good's weight claim in the present case, where a jury acquitted her of drug crimes but the court convicted her of the weapons crimes, and where some of the drugs were recovered from the same place as the firearms. Nevertheless, this Court has held "in a consolidated jury/nonjury trial, the trial court is not required to defer to the findings of the jury on common factual issues." Commonwealth v. Wharton, 594 A.2d 696, 699 (Pa. Super. 1991).

Lastly, Good maintains the trial court "improperly denied [her] the opportunity to have trial counsel accompany her" during the PSI interview. Good's Brief at 37. She insists the PSI is a "critical stage of the prosecution at which [her constitutional] right to counsel attached[.]" Id. Both the Commonwealth and the trial court contend this claim is controlled by the Pennsylvania Supreme Court's decision in Commonwealth v. Burton, 201 A.2d 675 (Pa. 1973). We agree.

In Burton, supra, the defendant, who had been convicted of second-degree murder, argued he was "entitled to an attorney during the course of his presentence interview by the probation department investigator, since it was a critical stage of the criminal process." Id. at 676. In rejecting his claim, the Supreme Court opined:

> In Commonwealth v. Stukes, 435 Pa. 535, 541, 257 A.2d 828 (1969), we defined 'a critical stage' as a 'situation(s) where legal rights may be preserved or lost, or where some factual or legal disadvantage may be suffered by the accused.'
>
> While the report may have some bearing on the sentence that it ultimately imposed, the investigator is not the decision-maker. The power to impose sentences is strictly within the province of the court. Thus, this case is distinguishable from such cases as Commonwealth v. Johnson, 428 Pa. 210, 236 A.2d 805 (1968), and Com. ex rel. Remeriez v. Maroney, 415 Pa. 534, 204 A.2d 450 (1964). In those cases, we recognized that, since sentencing is the last opportunity for the defendant to present matters and circumstances which may lead to his freedom, he should have an attorney to aid him in mustering the facts and arguments on his behalf.
>
> On the other hand, the presentence investigation is not a situation where legal rights must be preserved or lost. Instead, it is the first opportunity for the rehabilitative administration of the Commonwealth to interview the defendant, with a view to

determining what particular types of treatment or guidance the defendant needs for rehabilitation. In order to be effective, an investigator must build a certain rapport with the defendant, so that the true nature of the defendant's personality may be discovered. The presence of counsel at such an interview could only frustrate this purpose.

The defendant is adequately protected from any possible prejudicial inferences in the report. First, counsel has a right to examine the report before sentencing. Commonwealth v. Phelps, Pa., 301 A.2d 678 (1973). Then, if his client contests any portion of the report, counsel can offer evidence in rebuttal and disclose the inaccuracies in the report to the judge. We believe that this is sufficient.

Id. at 676-677.

In response, Good emphasizes Burton's "forceful dissent" authored by Justice Manderino, and insists the "state of law has changed significantly since 1973 in regards to what constitutes a 'critical stage' of prosecution[.]" Good's Reply Brief at 7. Accordingly, she "respectfully requests this Court to revisit this issue." Id. at 8. We decline to do so.

It is axiomatic that "[w]e, as an intermediate appellate court, are duty bound to effectuate the decisional law of the Supreme Court." Commonwealth v. Watson, 835 A.2d 786, 792 n.3 (Pa. Super. 2003). "This Court is bound by existing precedent under the doctrine of stare decisis and continues to follow controlling precedent as long as the decision has not been overturned by our Supreme Court." Commonwealth v. Reed, 107 A.3d 137, 143 (Pa. Super. 2014) (quotation omitted). Because Burton is controlling, Good is not entitled to relief on her final claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:   10/31/2018