**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Kevin POTTS, Appellant.**

Superior Court of Pennsylvania.

Argued June 25, 2013.

Filed Aug. 16, 2013.

Ruth A. Moyer, Philadelphia, for appellant.

Michael L. Erlich, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: GANTMAN, J., ALLEN, J., and PLATT, J.*

## OPINION BY PLATT, J.

Appellant, Kevin Potts, appeals from the judgment of sentence entered after his conviction of knowing and intentional possession, possession with intent to deliver a controlled substance (PWID), and use and possession of drug paraphernalia.[1] We affirm.

The trial court aptly set forth the factual background of this matter in its October 18, 2012 opinion as follows:

On January 30, 2011, at 3:30 PM, Officers John Higgins and Joseph McFillin responded to a 911 call for an alleged domestic dispute occurring at 509 West Girard Avenue. When Higgins and McFillin arrived, they heard screaming and yelling. After entering the apartment building,[a] they realized the screaming and yelling were coming from (what was later determined to be) the Appellant's second floor apartment. The officers knocked on his door for approximately [twenty[2]] seconds, and the screaming and yelling stopped. When nobody answered the door, Higgins and McFillin drew their weapons. After another ten seconds, Ms. Young finally opened the door.[b] Ms. Young was distraught, and her clothes were disheveled. She was also sweating, crying, and breathing heavily.[c]

---

[a] The front door was propped open with a newspaper.

[b] Ms. Young is the fiancée of [Appellant].

[c] It was a cold day in January.

Officer Higgins testified that it was obvious something was wrong. Higgins then saw ... Appellant run into a bedroom and shut the bedroom door. Ms. Young then walked into the living room but left the front apartment door open. At the motion to suppress hearing, Young conceded she never told the officers not to come in. After Young walked away from the doorway, Officers Higgins and McFillin put their guns away, entered the apartment, and walked behind Young into the living room. The officers asked Young if everything was all right and asked her to identify the man who had just run into the bedroom. Young told the officers that ... Appellant was her boyfriend.

Higgins and McFillin asked ... Appellant to come out of the bedroom while Young sat on the couch. After approximately five seconds, ... Appellant came out and shut the bedroom door behind him. When [ ] Appellant came out, he was sweating badly, seemed very scared, and was shaking. Having noticed Ms. Young's physical condition, and [ ] Appellant run into the bedroom, Higgins

---

* Retired Senior Judge assigned to the Superior Court.

1. 35 P.S. §§ 780–113(a)(16), (30), and (32), respectively.

2. See N.T. Suppression Hearing, 4/10/12, at 10.

and McFillin became concerned about Ms. Young's as well as their own safety. As a precautionary measure[,[d]] Officer Higgins briefly went into the bedroom to do a safety inspection. Although Officer Higgins did not see anyone inside the room, he saw an open black suitcase filled with a large amount of marijuana on the floor in front of a bed. Higgins showed the marijuana to McFillin who, in turn, called his supervisor. The supervisor sent Narcotics Field Unit officers to the apartment.

[d] According to Officer Higgins they decided to "clear the room" which means to look in the nearby areas to make sure there were no weapons or other people present that could pose a safety threat.

While Higgins and McFillin waited for the narcotics officers to arrive, they did not look in any other rooms. Although Higgins and McFillin could have done a protective sweep of the kitchen and another room behind the kitchen (that had a closed door), they chose not to do so. Instead, Higgins and McFillin limited their investigation only to the living room and the bedroom [ ] Appellant had entered. When the Narcotics Field Unit officers arrived, they requested a search warrant.[e] While the narcotics officers secured the premises, Higgins and McFillin took [ ] Appellant into custody and transported him to the police station.

[e] The Narcotics Unit did not conduct a search until it obtained a warrant.

[At 8:20 p.m.] that day, Officer [Perry] Betts and other officers executed a search warrant. Officers recovered from the bedroom the following evidence: three clear bags containing marijuana, one clear bag containing white powder cocaine, one clear bag containing [crack cocaine], two clear bags containing crystal methamphetamines, one amber pill bottle containing three Oxycodone or Oxycontin tablets, 65 [Oxycodone] pills marked A215, and three plates with residue. The officers also recovered a chest containing $7053 and $220 in [Appellant's] wallet. They further recovered from the bedroom: a key to the property, three ID cards with [Appellant's] name and picture, four pieces of mail with [Appellant's] name and the apartment address, three scales, four boxes of sandwich bags, a brown book, a false bottom can, a phone, and new and unused yellow packets. Finally, from [an empty bedroom] behind the kitchen, officers recovered [one bag of white powder cocaine and a second bag containing a white chunk of cocaine].

(Trial Court Opinion, 10/18/12, at 2–4 (emphases, record citations, and some footnotes omitted)).

Based on the foregoing, the Commonwealth charged Appellant with the previously mentioned crimes. Appellant filed a motion to suppress that the court denied after a hearing on April 10, 2012. Appellant waived his right to a jury trial and, on April 11, 2012, the court found him guilty of all charges. On May 25, 2012, Appellant replaced trial counsel. New counsel filed a timely motion for extraordinary relief, which the court denied on June 28, 2012. The same day, the court sentenced Appellant to a mandatory term on the PWID conviction of no less than five nor more than ten years' incarceration. Appellant timely appealed.[3]

Appellant raises one question for our review in which he asserts: "Under the Fourth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 8 of the Pennsylvania Constitution, did

3. Appellant filed a timely Rule 1925(b) statement on July 26, 2012 and the court filed a Rule 1925(a) opinion on October 18, 2012. See Pa.R.A.P. 1925.

the trial court err in failing to suppress evidence obtained as a fruit of the warrantless police entry into and search of Appellant's home?" (Appellant's Brief, at 4). Specifically, Appellant argues that no exceptions applied to support the police officer's warrantless entry into his apartment and search of his bedroom, and that they lacked valid consent to do so. (*See id.* at 12–32).

Our standard of review of the denial of a motion to suppress is well-settled:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Farnan,* 55 A.3d 113, 115 (Pa.Super.2012) (citation omitted).

Here, the court found that, in the totality of the circumstances, the police officers acted properly when they entered Appellant's home to investigate a possible emergency situation. (*See* N.T. Suppression Hearing, 4/10/12, at 83–84; Trial Ct. Op., 10/18/12, at 6). We agree.

Pursuant to the Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"Generally, the police will be excused from compliance with the warrant and probable cause requirements of the Fourth Amendment to the United States Constitution in only limited circumstances. One of these circumstances is when the police reasonably believe that someone within a residence is in need of immediate aid." *Commonwealth v. Galvin,* 603 Pa. 625, 985 A.2d 783, 795 (2009), *cert. denied,* 559 U.S. 1051, 130 S.Ct. 2345, 176 L.Ed.2d 565 (2010) (citations omitted). Additionally, "[i]t is widely recognized that situations involving the potential for imminent physical harm in the domestic context implicate exigencies that may justify limited police intrusion into a dwelling in order to remove an item of potential danger." *Commonwealth v. Wright,* 560 Pa. 34, 742 A.2d 661, 664 (1999) (citations omitted). The relevant inquiry is "whether there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger[.]" *Michigan v. Fisher,* 558 U.S. 45, 49, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (citation and internal quotation marks omitted). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff,* — U.S. —, 132 S.Ct. 987, 992, 181 L.Ed.2d 966 (2012) (citation omitted).

In this case, police officers responded to a 911 call for an alleged domestic dispute involving someone screaming at Appellant's apartment building. (*See* N.T. Suppression Hearing, 4/10/12, at 9). Upon arriving at the location, the officers heard the screams emanating from Appellant's apartment. (*See id.* at 10–11, 21, 43). As observed by the trial court, this not only corroborated the report of screaming in the distress call, but indicated that it had been going on "for qui[t]e some time." (*Id.* at 78). The officers announced themselves, knocked on Appellant's apartment door, and the screaming stopped within seconds. (*See id.* at 11–12, 22, 43). After knocking and announcing several more times over approximately ten seconds, Ms. Young opened the door. (*See id.* at 12). Ms. Young was "very distraught," "appeared to be crying," was sweating although it was a cold day in January, her breathing was "really heavy," and her clothes were "disheveled." (*Id.* at 12, 19, 48).

From the open doorway, the officers saw Appellant run into a bedroom directly behind the living room, shutting the door behind him. (*See id.* at 12–14). Ms. Young then walked into the living room, leaving the front door to the apartment open. (*See id.* at 28). Concerned for her safety, the officers followed Ms. Young into the apartment to ensure that she was not in danger. (*See id.* at 23, 28).

██ Based on this evidence, we conclude that the totality of the circumstances justified the police officers' reasonable belief that they needed to enter Appellant's apartment to ensure that Ms. Young was not in danger or in need of immediate aid. *See Ryburn, supra* at 992: *Fisher, supra* at 49, 130 S.Ct. 546; *Galvin, supra* at 795;

*Wright, supra* at 664. Accordingly, Appellant's argument that the police officers did not have a reason to enter his home without a warrant lacks merit.

Appellant also argues that, even if the officers lawfully entered his apartment to ensure Ms. Young's safety, they could not conduct a protective sweep of his bedroom because he had not yet been arrested. (*See* Appellant's Brief, at 29). Again, we disagree.

██ It is well-settled that "[u]nder emergent circumstances, protective sweeps are a well-recognized exception to the warrant requirement." *Commonwealth v. Witman,* 750 A.2d 327, 335 (Pa.Super.2000), *appeal denied,* 564 Pa. 138, 764 A.2d 1053 (2000), *cert. denied,* 534 U.S. 815, 122 S.Ct. 42, 151 L.Ed.2d 15 (2001).

A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). *Buie* sets forth two levels of protective sweeps. *Id.* at 334, 110 S.Ct. 1093. The two levels are defined thus:

> [A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Id.* Pursuant to the first level of a protective sweep, without a showing of even reasonable suspicion, police officers may

make cursory visual inspections of spaces immediately adjacent to the arrest scene, which could conceal an assailant. The scope of the second level permits a search for attackers further away from the place of arrest, provided that the officer who conducted the sweep can articulate specific facts to justify a reasonable fear for the safety of himself and others.

*Commonwealth v. Taylor*, 565 Pa. 140, 771 A.2d 1261, 1267 (2001), *cert. denied*, 534 U.S. 994, 122 S.Ct. 462, 151 L.Ed.2d 380 (2001).

▋ Finally,

**[i]f a suspect is dangerous, he is no less dangerous simply because he is not arrested.** If, while conducting a [protective sweep], the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression in such circumstances.

*Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (citations and quotation marks omitted) (emphasis added).[4]

In this case, the court found that "there were several reasons why Officer Higgins acted reasonably when he did a brief safety check of the adjacent bedroom." (Trial Ct. Op., 10/18/12, at 8). We agree.

▋ As we previously observed, Officers Higgins and McFillin were at Appellant's home to investigate a radio report of a person screaming. (*See* N.T. Suppression Hearing, 4/10/12, at 9). When the officers arrived at the scene, they heard the screaming coming from inside Appellant's apartment and, when Ms. Young opened the front door, she was distraught, sweat-

ing on a cold January day, crying, and breathing heavily, and her clothes were disheveled. (*See id.* at 12, 19, 48). From the open front doorway, the officers saw Appellant run into a bedroom adjacent to the front living room and shut its door. (*See id.* at 12–14)

Additionally, only after they "repeatedly asked" Appellant to come out of the bedroom, did he do so approximately five seconds later. (*Id.* at 23; *see id.* at 14). He was sweating heavily, shaking, and scared. (*See id.* at 14, 19). Because of Ms. Young's disheveled appearance and Appellant's "demeanor ... how he was acting and him running to the back room when [the police officers] entered ... [they] wanted to clear the room for safety ... [t]o make sure there were no weapons or other people ... to hurt [them]." (*Id.* at 15; *see id.* at 46).

Based on this testimony, we conclude that the record contained "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Taylor, supra* at 1267. Moreover, the fact that Appellant had not yet been arrested did not make the scene any less dangerous. *See Long, supra* at 1049–50, 103 S.Ct. 3469. Therefore, the officers were justified in performing a protective sweep of Appellant's bedroom. *See id.; Taylor, supra* at 1267.

▋ Additionally, the officers were not required to ignore the marijuana they saw in Appellant's bedroom while conducting the sweep. *See Long, supra* at 1049–50, 103 S.Ct. 3469. Therefore, the record supports the court's denial of Appellant's mo-

---

4. Although *Long* considered the propriety of a police officer's protective search of the glove compartment of an automobile during a traffic stop, the United States Supreme Court subsequently applied the holding of the case to its analysis of the protective sweep of a home. *See Buie, supra* at 327, 110 S.Ct. 1093.

tion to suppress. *See Farnan, supra* at 115. Appellant's issue does not merit relief.[5]

Judgment of sentence affirmed.

---

5. Moreover, based on our disposition of this matter, we conclude that Appellant's argument that the police officers did not have consent to enter either the apartment or his bedroom is moot. (*See* Appellant's Brief, at 23–28). Also, Appellant's argument that the plain view exception did not apply to allow for the warrantless confiscation of the marijuana is unavailing because the Narcotics Unit seized the marijuana after obtaining a warrant. (*See* N.T. Suppression Hearing, 4/10/12, at 32–35).