| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DOMINIQUE TASHAWN-TYRELL | : | No. 1490 MDA 2022 |
| HIGHTOWER | : | |

Appeal from the Suppression Order Entered October 13, 2022
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005926-2021

BEFORE:  LAZARUS, P.J., BOWES, J., OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., KING, J., BECK, J., and LANE, J.

OPINION BY NICHOLS, J.:                    **FILED: JUNE 25, 2025**

The Commonwealth appeals from the trial court's order granting Appellee Dominique Tashawn-Tyrell Hightower's motion to suppress.[1] The Commonwealth argues that the trial court erred in concluding that the plain view doctrine did not apply. We affirm.

### **Factual and Procedural History**

The trial court summarized the underlying facts of this matter as follows:

---

[1] In its notice of appeal, the Commonwealth certified that the trial court's suppression order would terminate or substantially handicap the prosecution of its case. ***See*** Pa.R.A.P. 311(d) (stating that "in a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution"); ***see also*** Notice of Appeal, 10/20/22, at 3 (unpaginated); Commonwealth's Brief at 1.

Under docket CP-67-CR-0005926-2021, [Appellee] was charged with [one] count [of] person not to possess, use, manufacture, control, sell or transfer firearms under 18 Pa.C.S.[] § 6105(a)(1), [four] counts [of] manufacture, deliver or possession with intent to manufacture or deliver under 35 P.S. § 780-113(a)(30), and [one] count [of] criminal conspiracy to manufacture, deliver or possession with intent to manufacture or deliver under 18 Pa.C.S.[] § 903(a)(1).  Under docket CP-67-CR-0005925-2021, Saquana Layer (Co-defendant) was charged with four counts of manufacture, deliver or possession  with intent to manufacture or deliver under 35 P.S. § 780-113(a)(30), and [one] count [of] criminal conspiracy to manufacture, deliver or possession with intent to manufacture or deliver under 18 Pa.C.S.[] § 903(a)(1).

The charges stem from an arrest that occurred on November 3, 2021, at 3972 Waverly Court in Springettsbury (the residence).

Trial Ct. Op., 12/22/22, at 1-2 (citations omitted and some formatting altered).

Appellee filed an omnibus pre-trial motion seeking to suppress the evidence obtained from the residence, arguing that police improperly searched the residence and the vehicle without warrants and/or the subsequently obtained warrants were improper.  *See* Omnibus Pretrial Mot., 2/22/22, at 3-6.  Co-defendant also filed a motion to suppress.  The trial court held a suppression hearing on both motions on April 8, 2022.

At the suppression hearing, the Commonwealth presented testimony from Detective Kyle Pitts, Officer Adam Nothstein, and Officer Peter Fouad of the York City Police Department.  *See* N.T., 4/8/22, at 4, 39, 50.

The trial court summarized the evidence presented at the suppression hearing as follows:

[Detective Pitts testified that York City Police were working with the U.S. Marshal Fugitive Task Force to execute an arrest warrant

for Appellee. *See* N.T., 4/8/22, at 4-6.] Prior to the arrest, law enforcement surveilled the residence for five days and only viewed [Appellee], Co-defendant, and their two children entering and exiting the residence. [Detective Pitts explained that the police did not observe the back door of the residence during these five days of surveillance because they did not have the manpower and were not in a position to do so. *See* N.T., 4/8/22, at 28, 37.] On the day of the arrest, police and U.S. Marshalls knocked and announced their presence to serve the arrest warrant on [Appellee]. [Officer Nothstein] saw movement in the second-floor window. There was a slight struggle during the arrest as [Appellee] came out of the front door of the residence. [After a brief struggle, officers took Appellee to the ground and placed him in handcuffs. *See* N.T., 4/8/22, at 40-42, 52.] It appeared to law enforcement that there was someone else inside [the residence] trying to shut the door [after Appellee had gone outside].

Law enforcement then entered the residence to conduct a protective sweep. Law enforcement located Co-defendant and the two children on the first floor before proceeding up the stairs to the second floor. Detective Pitts testified that once law enforcement had eyes on Co-defendant and the two children, it was clear they were not a security threat and were not placed in handcuffs.

The purpose of conducting the protective sweep on the second floor was to look for individuals who might interfere with the arrest or create a security threat. As law enforcement conducted the protective sweep of the second floor, Officer Fouad saw "cherry gelato, foil bags, a box of sandwich baggies, [and] loose marijuana" on a dresser in the upstairs bedroom. Additionally, Officer Fouad testified he saw wads of cash in the top drawer of the dresser, which was "cracked open." However, Defense Exhibit 6, a photograph of the dresser, shows the top drawer closed, whereas Defense Exhibit 4 shows it ajar, with no cash visible [in the drawer]. The dresser was against the back of the wall where Officer Fouad agreed that a person could not fit in the drawers or behind the dresser.

Based on the evidence found during the protective sweep, Officer Fouad obtained a search warrant for the residence [(the house warrant)]. Within the residence, law enforcement utilized the [house] warrant to seize "quantities of marijuana, numerous individual packages of crack/powder cocaine, [] fentanyl packed

for sale[,] a significant sum of cash, packaging material, digital scales, and new/used packaging material."

Furthermore, a key fob was found inside a black hoodie law enforcement previously saw [Appellee] wearing. Law enforcement did not know which vehicle went with the key fob, so the alarm locator was utilized to find it. After realizing the key fob went to a Honda Accord, Officer Fouad then peered into the vehicle and saw the bottom grip of a handgun sticking out from under the driver's seat of the Honda Accord. The handgun was then seized and cleared. After K-9 Khan, a certified narcotics dog, alerted to the vehicle, Officer Fouad applied for and received a search warrant of that vehicle [(the vehicle warrant)]. The evidence seized from the Honda Accord with New Jersey license plate L76LXJ, included a black Glock 22 .40 caliber handgun with serial number BFAW862, a magazine containing live .40 caliber rounds and one ejected live .40 caliber round.

Trial Ct. Op., 12/22/22, at 2-4 (citations omitted and some formatting altered).

On October 13, 2022, the trial court issued an order and opinion setting forth its findings of fact and conclusions of law. The trial court explained that the Commonwealth had presented sufficient articulable facts to support a belief that there were additional individuals inside the residence who could pose a threat to the officers' safety. *See* Trial Ct. Op. & Order, 10/13/22, at 7-8. Therefore, the trial court concluded that a protective sweep of the entire residence was proper. *See id.* The trial court also concluded that the police exceeded the scope of a protective sweep by searching the dresser in the bedroom because it was not an area where a person could reasonably be expected to hide. *See id.* at 8-9. The trial court further explained that because the house warrant was invalid, the vehicle warrant was not supported

- 4 -

by probable cause. ***See id.*** at 10. Therefore, the trial court granted Appellee and Co-defendant's suppression motions. ***See id.***

The Commonwealth filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion addressing the Commonwealth's claims.

## Analysis

On appeal, the Commonwealth raises the following issues:

1. The trial court erred by misapplying the plain view doctrine, having previously found that the protective sweep of the second floor was found to have been justified by specific and articulable facts. Because the protective sweep of the second-floor master bedroom was valid, law enforcement had a lawful vantage point to see items in plain view in the bedroom.

2. The trial court further erred in finding that the search warrant for the home lacked probable cause and was therefore invalid. More specifically, the trial court erred in finding that the loose marijuana, cherry gelato foil bags, and sandwich baggies, found on top of the dresser, in plain view, during the protective sweep, did not constitute probable cause for a search warrant of the residence.

Commonwealth's Brief at 4.[2]

---

[2] We note that in its Rule 1925(b) statement, the Commonwealth also argued that the trial court erred by suppressing a key fob recovered during the execution of the house warrant and the evidence seized pursuant to the vehicle warrant as fruits of the poisonous tree. ***See*** Rule 1925(b) Statement, 11/10/22, at 2 (unpaginated). However, the Commonwealth and the trial court acknowledge that the issue of the legality of the warrants is controlled by this Court's disposition of the arguments concerning the protective sweep and plain view doctrine. ***See*** Commonwealth's Brief at 4, 8-9, 27-28; Trial Court Op., 12/22/22, at 10; ***see also Commonwealth v. Williams***, 2 A.3d 611, 619 (Pa. Super. 2010) (*en banc*) (explaining that "[t]he exclusionary rule
*(Footnote Continued Next Page)*

The Commonwealth's issues are interrelated; therefore, we address them together. The Commonwealth contends that the trial court erred in granting the suppression motion because Officer Fouad had a lawful vantage point in the bedroom because he was performing a protective sweep, Officer Fouad observed unused packaging material and pieces of marijuana atop the dresser in plain view, and Officer Fouad did not open or manipulate the dresser to view them. *Id.* at 15. The Commonwealth argues that although the purpose of the protective sweep is to ensure officer safety, there is no restriction on the length of time an officer may observe an item in plain view during a protective sweep. *Id.* at 16-18 (citing, *inter alia*, **Arizona v. Hicks**, 480 U.S. 321 (1987); **Commonwealth v. Pine**, 536 A.2d 811 (Pa. Super. 1988); **Commonwealth v. Marsicano**, 1047 MDA 2014, 2015 WL 7282745 (Pa. Super. filed May 6, 2015) (unpublished mem.)).[3] The Commonwealth

---

also applies to any evidence discovered as a result of the original illegal police conduct; such evidence is termed 'fruit of the poisonous tree'" (citation omitted)). For the reasons set forth below, we conclude that the search of the dresser was illegal; therefore, it could not serve a basis for the subsequent application for the house warrant. **See Williams**, 2 A.3d at 619. Further, as stated above, the police relied on the key fob that they had found during the execution of the house warrant in the application for the vehicle warrant. Therefore, Commonwealth is not entitled to relief regarding these items under the fruits of the poisonous tree doctrine. **See id.**

[3] We note that **Marsicano** is an unpublished decision by this Court that was filed prior to May 1, 2019. Therefore, that case is not only non-precedential, but it may not be cited or relied upon even for its persuasive value. **See** Pa.R.A.P. 126(b); **see also Commonwealth v. James**, 297 A.3d 755, 767 n.8 (Pa. Super. 2023), *appeal denied*, 309 A.3d 691 (Pa. 2023).

further claims that "[t]he suppression court's finding that the protective sweep of the [bed]room was validly conducted" is not before this Court because Appellee did not appeal this determination. *Id.* at 13 (some formatting altered).

Additionally, the Commonwealth argues that although Officer Fouad only observed the items atop the dresser for a few seconds, he immediately concluded, based on his training and experience, that the unused packaging materials and loose marijuana was evidence of possible drug crimes. *Id.* at 18-19. The Commonwealth concludes that the trial court erred in its application of the protective sweep and plain view doctrines by concluding that the officer may not consider items in plain view if they are not relevant to the purpose of the protective sweep, *i.e.*, to locate individuals who may pose a danger to the police who applying an overly technical standard to determine whether the officer recognized the marijuana and packaging materials as evidence of a crime. *Id.* at 22-23.

Lastly, the Commonwealth argues that the trial court erred by concluding that Officer Fouad's application for the house warrant was not supported by probable cause. *Id.* at 23-27. Specifically, the Commonwealth contends that even if Officer Fouad's observations regarding the cash in the top drawer of the dresser were excluded from the affidavit of probable cause, the presence of marijuana and materials used to package and sell marijuana established probable cause for the magistrate to issue the house warrant. *Id.* at 26-27.

Appellee responds that the protective sweep of the residence "was not justified by a reasonable suspicion of danger to the officers that performed the arrest. The police did not observe any weapons or hear or see anything that would lead them to believe other people were present on the second floor." Appellee's Brief at 15. Appellee argues that this Court should affirm the trial court's suppressing the officers' "observations that were made from an unlawful vantage point" and all evidence recovered pursuant to the house warrant "because they were all the fruit of the initial illegal entry." *Id.* at 15-16.

We begin with our well established standard of review:

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. [Where the defendant] prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Cartagena*, 63 A.3d 294, 298 (Pa. Super. 2005) (*en banc*) (citations omitted); *see also Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) (explaining that an appellate court conducts *de novo* review over the suppression court's legal conclusions (citation omitted)).

This Court has explained that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented. ***Commonwealth v. Heidelberg***, 267 A.3d 492, 499 (Pa. Super. 2021) (*en banc*) (citation omitted). Moreover, the law is well settled that if the record supports the result reached by the suppression court, we may affirm on any ground. ***Cartagena***, 63 A.3d at 301 (citation omitted).

Additionally, it is well established:

> Both the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures. As a general rule, a [search] warrant stating probable cause is required before a police officer may search for or seize evidence. Absent the application of one of a few clearly delineated exceptions, a warrantless search or seizure is presumptively unreasonable.

***Heidelberg***, 267 A.3d at 502 (citations omitted and formatting altered). Further, "[t]he remedy for illegal searches and seizures is exclusion of the evidence[.]" (citation omitted)). ***Id.*** at 499.

This Court has explained:

> Police may perform a protective sweep as an incident to a lawful arrest, in order to protect the safety of police officers and others. ***See*** [***Maryland v. Buie***], 494 U.S. 325, 327 (1990). In such circumstances, officers may look into "spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without any degree of suspicion other than that necessary to support the arrest. ***Buie***, 494 U.S. at 327. A protective sweep beyond such immediately adjoining areas is proper if police can articulate specific facts to justify a reasonable fear for the safety of police officers or others. We consider the

> information available to police at the time of the sweep from the perspective of a reasonably prudent police officer.

*Commonwealth v. Hall*, 199 A.3d 954, 959 (Pa. Super. 2018) (footnote and some citations omitted and some formatting altered).

In *Commonwealth v. Potts*, 73 A.3d 1275 (Pa. Super. 2013), this Court reiterated that there are two levels of protective sweep under *Buie*: the first level is limited to spaces immediately adjacent to the place of arrest that could conceal an assailant and does not require any separate reasonable suspicion. The second level is a search for potential attackers further away from the place of arrest, which requires that the officer(s) conducting the sweep identify specific facts to justify a reasonable fear for the safety of the officer(s) and others. *Potts*, 73 A.3d at 1281-82; *see also Commonwealth v. Crouse*, 729 A.2d 588, 598 (Pa. Super. 1999) (stating that a protective sweep must be supported by articulable facts and inferences giving rise to reasonable suspicion that the area to be swept harbors an individual posing a danger to the police). Further, it is well established that "even a combination of innocent facts, when taken together" may give rise to reasonable suspicion. *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004) (citation omitted and formatting altered).

This Court has further explained that a protective sweep "is for persons. It cannot be used as a pretext for an evidentiary search. It cannot be lengthy or unduly disruptive. It must be swift and target only those areas where a person could reasonably be expected to hide." *Crouse*, 729 A.2d at 598.

Another exception to the warrant requirement is the plain view doctrine.

*See Commonwealth v. Saunders*, 326 A.3d 888, 893 n.2 (Pa. 2024).

Recently, our Supreme Court reiterated:

The plain view doctrine is wholly applicable to seizure issues under both the Fourth Amendment and Article I, Section 8. Under the plain view doctrine, the police may effectuate a warrantless seizure of an item if: (1) the police view the item from a lawful vantage point; (2) the incriminating nature of the item is immediately apparent; and (3) the police have a lawful right of access to the item.

*Saunders*, 326 A.3d at 897 (citations omitted and some formatting altered);

*see also Potts*, 73 A.3d at 1282 (stating that "[i]f, while conducting a [protective sweep], the officer should, . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband" (citation omitted)).

The *Saunders* Court further explained:

The immediately apparent requirement is coextensive with probable cause. . . . Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. Probable cause is a practical, non-technical concept that is evaluated under a traditional totality-of-the-circumstances test.

*Saunders*, 326 A.3d at 897 (citations and quotation marks omitted).

"In determining whether the incriminating nature of an object [is] immediately apparent to the police officer, we look to the totality of the circumstances. An officer can never be one hundred percent certain that a substance in plain view is incriminating, but his belief must be supported by

- 11 -

probable cause." ***Commonwealth v. Liddie***, 21 A.3d 229, 236 (Pa. Super. 2011) (*en banc*) (citations omitted and some formatting altered).

> "A police officer's experience may fairly be regarded as a relevant factor in determining probable cause." ***Commonwealth v. Thompson***, 985 A.2d 928, 935 (Pa. 2009). An officer, however, cannot simply reference "training and experience abstract from an explanation of their specific application to the circumstances at hand." ***Id.*** "A court cannot simply conclude that probable cause existed based upon nothing more than the number of years an officer has spent on the force. Rather, the officer must demonstrate a nexus between his experience and the search, arrest, or seizure of evidence." ***Id.*** Indeed, a factor becomes relevant only because it has some connection to the issue at hand.

***Commonwealth v. Randolph***, 151 A.3d 170, 183 (Pa. Super. 2016) (citation and footnote omitted).

In ***Randolph***, this Court held that a state trooper failed to establish probable cause to search a steel box welded to the interior of the defendant's vehicle because the trooper "failed to explain how his training and experience led him to recognize that the [box] was commonly used to transport guns, drugs and U.S. currency." ***Id.*** at 184 (some formatting altered). The ***Randolph*** Court further observed that the trooper "neglected to list what classes he has attended or certifications he has received on this subject, the number or type of cases he has participated in where officers discovered hidden compartments containing drugs or weapons, or even how long he has been a law enforcement officer." ***Id.*** Therefore, this Court concluded that the trooper's "claim of knowledge and experience was an empty phrase that failed

to tilt the scales toward probable cause." *Id.* (citation omitted and some formatting altered).

In *Potts*, this Court affirmed the trial court's order denying the defendant's motion to suppress marijuana found in an open suitcase which the police observed while conducting a protective sweep incident to their response to a domestic disturbance 911 call. *Potts*, 73 A.3d at 1278-79. The *Potts* Court explained "the officers were not required to ignore the marijuana they saw in [the defendant's] bedroom while conducting the [protective] sweep." *Id.* at 1282 (citation omitted).

Similarly, in *Crouse*, this Court held that state police troopers properly seized a pipe used to smoke marijuana, which the troopers observed while conducting a protective sweep in connection with the execution of an arrest warrant. *Crouse*, 729 A.2d at 593, 598. In that case, the state police were executing an arrest warrant for the defendant's father when they heard the defendant's mother yelling upstairs. *Id.* at 590. The troopers went to the second floor and found the defendant in one of the bedrooms. *Id.* One of the troopers then quickly looked around the defendant's bedroom for any weapons and saw the marijuana pipe on a nightstand next to the bed. *Id.* at 590-91. This Court explained that the state troopers lawfully entered the defendant's bedroom while conducting a protective sweep and properly seized the marijuana pipe because it was in plain view. *Id.* at 593, 598.

Here, the trial court explained:

Initially, this court holds there were just enough "articulable facts" to support the second of prong of **Buie**, showing the need for a protective sweep. **See Maryland v. Buie**, 494 U.S. 325, 327 (1990). Because law enforcement could not see the back of the house, there could have been more occupants in the residence, which posed a safety threat to the officers. The movement in the upstairs window blind[s], resistance at the front door during the arrest, and someone pushing the front door shut, provided the need for a protective sweep to help ensure officer safety while the arrest was completed.

\* \* \*

Although the movement of the window blinds supported a protective sweep of the upstairs, this court holds the protective sweep exceeded the cursory inspection allowed under such conditions as there were not enough "articulable facts and inferences [to give] rise to reasonable suspicion" to conduct a more thorough search of the dresser area. Officer Fouad saw loose marijuana and circled several specks of loose marijuana he saw on top of that dresser when shown a picture of the dresser on cross-examination. [**See** Defendant's Ex. 1, 3, 5.] Officer Fouad testified that no person could fit either behind the dresser or in the dresser drawers. Therefore, a "swift" search of that area would not have led a reasonably prudent officer to see tiny specks of marijuana on top of the dresser nor to make out the specificity of the items listed in the [house] search warrant for the residence, namely the "Lemon Cherry Gelato[] resealable bags[] and a box of clear sandwich baggies." Although Officer Fouad's training and experience led him to believe that the "lemon cherry gelato[] foil bags[] and a box of sandwich baggies" were indicative of a drug sale when combined, those items are not illegal to own. Additionally, this court finds Officer's Fouad's testimony regarding the wads of cash in the top drawer of the dresser to be inconsistent with the evidentiary photographs of the dresser. Defendant's Exhibit 6[.]

[Trial Ct. Op. & Order, 10/13/22, at 7-9.]

\* \* \*

This court recognizes that the protective sweep in this situation put the officer in a lawful vantage point in the second-floor

- 14 -

bedroom. Therefore, the first prong of the plain view doctrine was met in this case.

However, this court contends that the second prong of the plain view doctrine has not been met. For that analysis, this court analyzed the series of events under both the protective sweep and the plain view doctrine in conjunction. Simply because law enforcement was in a lawful position does not mean the bounds of the protective sweep no longer apply. Looking at the evidentiary photographs in conjunction with Officer Fouad's testimony, this court does not find that a reasonably cautious man conducting a protective sweep to search for persons, would have spotted tiny specks of loose marijuana sitting amongst a variety of items on top of a dresser. Based on the small size of the specks, a person swiftly looking for a person behind a door that has a dresser behind it would not have a need to closely look on top of said dresser and would therefore, not see such small specks in amongst a variety of other items.

Trial Ct. Op., 12/22/22, at 6-9 (some citations omitted and some formatting altered).

Based on a review of the record, we conclude that the trial court's factual findings are supported by the record and are binding on this Court. *See Heidelberg*, 267 A.3d at 498-99. Particularly, the trial court found that Officer Fouad's testimony concerning the open drawer was not credible because crime scene photos revealed that the drawer was closed. *See* Trial Ct. Op. & Order, 10/13/22, at 4-5, 9. Because the house warrant was based, in part, on the money in the drawer that Officer Fouad allegedly saw during the protective sweep, and because the trial court did not credit this testimony, the only remaining information supporting the house warrant were specks of suspected marijuana and the gelato bags Officer Fouad characterized as drug

packaging materials that he also observed during the protective sweep.[4] *See id.* at 8.

### Protective Sweep

We begin with the trial court's conclusion that the Commonwealth presented sufficient articulable facts to justify that the police officers had a reasonable fear for their safety or of the safety of others. The Commonwealth opines that the legality of the protective sweep is not at issue here. However, it is axiomatic that an appellate court's scope of review of the legal conclusions supporting a trial court's suppression order is plenary and *de novo*; therefore, the trial court's conclusions are not binding on this Court in its determination as to whether the trial court committed legal error. *See Brown*, 996 A.2d at 476; *Cartagena*, 63 A.3d at 298. Here, the trial court made several factual findings relevant to the protective sweep including its determination that the police observed movement at an upstairs window after knocking on the front door of the residence, and that a person pulled the front door shut when officers were attempting to enter. *See* Trial Ct. Op., 12/22/22, at 6. The trial court concluded that when Appellee exited the residence, he physically resisted arrest, and that someone inside the residence was attempting to close the front door, and further, officers did not surveil nor observe the back of the residence. *See id.*

---

[4] Further, the Commonwealth is not arguing that the money inside the dresser drawer should be considered in determining probable cause to support the house warrant. *See* Commonwealth's Brief at 10 n.1.

Based on these facts, the trial court determined that the police had reasonable suspicion to conclude that unknown individuals could be inside the residence, other than Co-defendant Layer and the two children, that could pose a threat to officer safety, which justified a protective sweep of the entire residence. *See id.* at 6-7. We agree. Accordingly, the second level of protective sweep is triggered, as the police possessed specific articulable facts that support a reasonable fear that there were one or more unknown individuals in the residence who could pose a safety risk to the officers. *See Hall*, 199 A.3d at 959; *Potts*, 73 A.3d at 1281-82; *Crouse*, 729 A.2d at 598. Here, similar to *Crouse*, the police were serving an arrest warrant when they became aware of the apparent presence of an unidentified individual on the second floor of the residence. *Compare Crouse*, 729 A.2d at 590 (explaining that the state troopers were executing an arrest warrant for the defendant's father when they heard the defendant's mother yelling upstairs) *with* N.T., 4/8/22, at 40 (reflecting that Officer Nothstein testified that he saw movement in the second-floor window).[5] Based on a totality of the circumstances, including, the movement at the window, the attempt by an unidentified person to shut the front door while Appellee was being arrested, and the inability of the police to observe the back door of the residence support a reasonable

_____

[5] As we have noted, movement in the second-floor window supported a reasonable suspicion that there may have been one or more unidentified individuals in the residence who posed a safety risk to the police. *See generally Rogers*, 849 A.2d at 1189 (describing how innocent facts, when examined together, can establish reasonable suspicion).

inference that an unknown individual could have entered the residence through the back door that could pose an articulable safety risk to officer safety. For these reasons, we conclude that the second-floor protective sweep was proper.

Search of the Top of the Dresser

Next, the trial court reasoned that because the protective sweep included the second floor of the residence, Officer Fouad viewed the contents of the master bedroom from a lawful vantage point for the purposes of the plain view doctrine. **See** Trial Ct. Op., 12/22/22, at 8-9. However, the trial court determined that Officer Fouad merely observed the tiny, de minimis specks of purported loose marijuana and lemon cherry gelato foil bags among a clutter of items on the dresser that did not satisfy the second prong of the plain view doctrine requiring the incriminating nature of an item to be immediately apparent. **See** Trial Ct. Op., 12/22/22, at 9-10.

Based on our review of the record, we agree with the trial court that the search of the top of the dresser exceeded the scope of a quick, cursory inspection for harmful items. The record reflects that Officer Fouad testified that the door to the master bedroom on the second floor was open. **See** N.T., 4/8/22, at 53-54, 60, 70. Upon entering the master bedroom, Officer Fouad checked to see if anyone was hiding behind the door. **See id.** at 63-64. The officer testified that there was a dresser partially open behind the master bedroom door with its back against the bedroom wall. **See id.** at 54, 62; **see also** Defendant's Ex. 6. Officer Fouad testified that on top of the dresser there

were "cherry gelato[] foil bags, a box of sandwich baggies, [and] loose marijuana. The top drawer of the dresser was cracked open, and I could see inside the drawer wads of cash in plain view." N.T., 4/8/22, at 54. The trial court determined that Officer Fouad merely observed tiny specks of what he thought could be loose marijuana on the top of the dresser. *See* Trial Ct. Op., 12/22/22, at 9; *see also* N.T., 4/8/22, at 54, 64-65; Defendant's Ex. 5 (photograph of the top of the dresser depicting a plastic bag containing dollar bills and coins next to three barely visible circled specks of green material).[6] Officer Fouad then applied for the house warrant based on these observations. *See* N.T., 4/8/22, at 55.

This Court emphasized in *Crouse* that the purpose of a protective sweep is to look for individuals who might pose a danger to police, and "[i]t must be swift and target only those areas where a **person could reasonably be expected to hide**[,]" and "[i]t cannot be used as a pretext for an evidentiary search." *Crouse*, 729 A.2d at 598 (emphasis added). Clearly, officers are "not required to ignore" contraband in plain view while conducting a protective sweep. *See Potts*, 73 A.3d at 1282. In *Potts* and *Crouse*, the police officers readily observed objects of an immediately apparent incriminating nature, including an open suitcase full of marijuana on the floor and a marijuana pipe on a nightstand in the same room as the defendant, respectively. *See Potts*,

---

[6] We have attached Defendant's Exhibits 4 and 5 to this Opinion as "Appendix A." Additionally, we note that Officer Fouad used a pen to circle the objects in Defendant's Exhibit 5 that he asserted was loose marijuana. *See* N.T., 4/8/22, at 54, 64; Trial Ct. Op. & Order, 10/13/22, at 8.

73 A.3d at 1278-79; **Crouse**, 729 A.2d at 590. Additionally, in **Crouse**, the defendant was present in the room with the marijuana pipe, which the trooper observed while looking for weapons in plain view. **See Crouse**, 729 A.2d at 590.

On this record, including the evidentiary photographs, we agree with the trial court that a reasonably prudent police officer conducting a protective sweep for persons and harmful items that could pose threats to officer safety, which included the swift and cursory search of the top of the dresser, would not have led a reasonable officer to see such tiny, de minimis specks of contraband, nor would it justify the utilization of lemon cherry gelato resealable bags and a box of clear sandwich bags, which are not illegal to own, as the basis for Officer Fouad's application for the house warrant. **Compare** Trial Ct. Op., 12/22/22, at 9-10 **with Crouse**, 729 A.2d at 590-91 (the officer properly seized a marijuana pipe he observed while looking around the room for any weapons that the defendant could use). For these reasons, we agree with the trial court that the Commonwealth failed to establish the immediately apparent prong of the plain view doctrine in the context of a protective sweep.

<u>Incriminating Nature of the Items on Top of the Dresser</u>

On this record, Officer Fouad did not identify any incriminating characteristics of the de minimis specks pictured on the top of the dresser, such as an odor or color, that would have led him to believe that the tiny specks were loose marijuana. He baldly testified to observing foil bags with lemon cherry gelato written on them and asserted that they were used as

packaging materials for marijuana without further explanation. *See* N.T., 4/8/22, at 54-55; Defendant's Ex. 2, 4 (photograph of the top of the dresser depicting the gelato foil bags). Officer Fouad then applied for the house warrant based on these observations. *See* N.T., 4/8/22, at 55.

Accordingly, the trial court properly concluded that the Commonwealth failed to prove that the criminality of the items observed on top of the dresser was immediately apparent, a necessary prong of the plain view doctrine.

Officer's Training and Experience

At the suppression hearing, Officer Fouad testified that he had been working for the York City Police Department for four years. *See* N.T., 4/8/22, at 50. He simply testified that "[i]n my training and experience, [the gelato foil bags are] packaging for" marijuana without further explanation. *Id.* at 65. Officer Fouad did not provide any additional testimony about his training about and/or experience with illicit narcotics or how his training and experience led him to recognize either the tiny specks as loose marijuana or the gelato foil bags as contraband.

The Commonwealth did not present any evidence regarding Officer Fouad's training and experience regarding the identification of illegal drugs or the packaging and trafficking of illegal drugs. Therefore, the Commonwealth failed to establish how it was immediately apparent to Officer Fouad that the barely visible specks were marijuana and that the gelato foil bags were drug packaging materials based on the officer's police training. *See Thompson*, 985 A.2d at 935 (explaining that while an officer's training and experience is

relevant to evaluating probable cause, but an officer cannot "simply reference training and experience abstract from an explanation of their specific application to the circumstances at hand" (citation omitted)); **Randolph**, 151 A.3d at 183-84 (explaining the officer must demonstrate a nexus between his training and/or experience and the item at issue to establish probable cause to conduct a search); **see also Saunders**, 326 A.3d at 897 (explaining that the immediately apparent requirement of the plain view doctrine is "coextensive with probable cause" (citations omitted)).

Additionally, the Commonwealth's reliance on **Hicks** and **Pine** to support its argument that the trial court erred by concluding that Officer Fouad exceeded the permissible scope of a cursory examination of the top of the dressers for harmful items is misplaced. Both of those cases involved officers moving objects in plain view to examine nonvisible parts of the objects for purposes of criminal investigation. In **Pine**, the officer moved a television, believed to be stolen, to examine its serial numbers. **See Pine**, 536 A.2d at 816-18. In **Hicks**, the officers moved stereo equipment to examine and record serial numbers to determine if the equipment was stolen during an armed robbery. **See Hicks**, 480 U.S. at 323-29. Instantly, Officer Fouad was conducting a cursory protective sweep of the top of the dresser for officer safety, not an examination of equipment to examine its serial numbers as part of an investigation to determine if the personal property was stolen. Therefore, **Hicks** and **Pine** are distinguishable from the case *sub judice*. For

these reasons, we conclude that the marijuana and the gelato foil bags are inadmissible.

Search of the Inside of the Dresser

Further, we agree with the trial court that the search of the inside of the dresser was illegal. First, the trial court did not credit Officer Fouad's testimony regarding the "wads of cash" because the trial court concluded that drawer was not open. *See* Trial Ct. Op. & Order, 10/13/22, at 7. That credibility determination is binding on this Court because it is consistent with the record. *See Heidelberg*, 267 A.3d at 498-99. Next, Officer Fouad conceded that a person could not hide behind the dresser because it was backed up to a wall, and that a person could not hide inside the dresser drawers. *See* N.T., 4/8/22, at 62; *see also* Defendant's Ex. 6. Officer Fouad explained that a person could not fit inside any of the dresser drawers and that no one could hide behind the dresser because it was against the wall. *See* N.T., 4/8/22, at 62.

Therefore, searching inside the drawers would exceed the parameters of a protective sweep for persons that could be hiding. *See* Trial Ct. Op. & Order, 10/13/22, at 8; Trial Ct. Op., 12/22/22, at 9; *see also* Defendant's Ex. 6 (photograph of the dresser which is positioned in a corner of the room with the door to the right of the dresser). On this record, the trial court properly determined that Officer Fouad lawfully entered the bedroom to perform a protective sweep for persons hiding on the second floor, and that the officer exceeded the scope of that protective sweep for persons by

conducting an impermissible evidentiary search inside of the dresser because the dresser was not a place where a person could reasonably be expected to hide. **See Crouse**, 729 A.2d at 598; **see also** Trial Ct. Op., 12/22/22, at 7 (instantly, the trial court found the officer's testimony that the drawer was ajar and that a large amount of money was in the drawer not credible). For these reasons, we conclude that the Commonwealth has failed to establish that the officer observed the money inside the dresser drawer from a lawful vantage point for the purposes of the plain view doctrine.[7] **See Saunders**, 326 A.3d at 897.

## Conclusion

In conclusion, we hold that the Commonwealth established that the police had reasonable suspicion that unknown individuals could be inside the residence, other than Co-defendant and the two children, that could pose a threat to officer safety, and that the protective sweep of the entire residence was legal.

However, the police exceeded the scope of that protective sweep by conducting an evidentiary search inside the dresser of the master bedroom, which was not a location behind or inside of which a person could be

_____

[7] As noted above, the Commonwealth does not argue that the money inside the dresser drawer should be considered in determining probable case for the subsequent house warrant. **See** Commonwealth's Brief at 10 n.1. However, because we conduct a *de novo* review of suppression orders, we addressed the trial court's conclusions about the money in the dresser drawer. **See Brown**, 996 A.2d at 476.

reasonably expected to hide. As such, the money inside the dresser is not admissible under the plain view doctrine because the officer did not observe them from a lawful vantage point.

Further, the search of the top of the dresser exceeded the allowable scope of the protective sweep because Officer Fouad's observation of several tiny, de minimis specks of material and foil gelato bags amidst the cluttered contents on the top of the dresser was inadequate to draw the bald conclusion that these materials were loose marijuana and that the foil bags were drug packaging material. This examination exceeded the swift search for persons and weapons permitted in a protective sweep. Additionally, the Commonwealth failed to establish that the incriminating nature of the tiny specks of material or the gelato foil bags on the top of the dresser was immediately apparent because the Commonwealth did not present any evidence regarding Officer Fouad's training and experience and connecting that training and experience to the identification of the items as contraband. Therefore, this evidence is not admissible under the plain view doctrine.

Accordingly, the improper search of the top of the dresser that exceeded the allowable scope of the protective sweep cannot serve as a basis for the probable cause to support the subsequent applications for the house and vehicle warrants.[8] *See, e.g.*, *Williams*, 2 A.3d at 619. For these reasons,

---

[8] As noted, the Commonwealth and trial court agree that this Court's disposition of this issue controls the legality of the subsequently obtained
*(Footnote Continued Next Page)*

the Commonwealth is not entitled to relief, and we affirm the trial court's order granting Appellee's motion to suppress. ***See Cartagena***, 63 A.3d at 301 (explaining that this Court may affirm a suppression order on any ground if the record supports the result that the trial court reached).

Order affirmed. Jurisdiction relinquished.

Judge Kunselman, Judge Murray, and Judge Lane join the Opinion.

Judge Bowes files a Dissenting Opinion which P.J. Lazarus, Judge Olson, Judge King and Judge Beck join.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/25/2025

---

house and vehicle warrants under the fruit of the poisonous tree doctrine. ***See*** Commonwealth's Brief at 4, 8-9, 27-28; Trial Court Op., 12/22/22, at 10. The claims concerning the house and vehicle warrants are rendered moot by our disposition affirming suppression.

**Appendix A**





Comm. v. Hightower, Dominique Tashawn-Tyrell
CP-67-CR-0005926-2021

Comm. v. Layer, Saquana Tawane
CP-67-CR-0005925-2021

DEFENDANT'S
EXHIBIT
5

PENGAD 800-631-6989

IK 4|8|22